PEOPLE OF the STATE OF CALIFORNIA; Public Utilities Commission of the State of California, Petitioners,

North American Telecommunications Association ("NATA"); National Association of Regulatory Commissioners ("NARUC"); Missouri Public Service Commission ("MPSC"), Petitioners–Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent,

Pacific Bell, et al., Respondents–Intervenors.

PEOPLE OF the STATE OF CALIFORNIA; Public Utilities Commission of the State of California, Petitioners,

North American Telecommunications Association ("NATA"); National Association of Regulatory Commissioners ("NARUC"), Petitioners–Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent,

Ameritech Operating Companies (Illinois Bell Telephone Co., Indiana Bell Telephone Co. Incorp., Michigan Bell Telephone Co., Ohio Bell Telephone Co., Wisconsin Bell, Inc.); et al., Respondents–Intervenors.

PEOPLE OF the STATE OF CALIFORNIA; Public Utilities Commission of the State of California, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent.

PEOPLE OF the STATE OF NEW YORK, Petitioner,

North American Telecommunications Association ("NATA"); Pacific Bell, Nevada Bell, Pactel Communications Companies, and Pacific Telesis Group; Iowa Utilities Board, Petitioners–Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent,

Bell Atlantic Telephone Companies ("Bell Atlantic"); et al., Respondents–Intervenors.

PEOPLE OF the STATE OF NEW
YORK, Petitioner,

Pacific Bell, Nevada Bell, Pactel Commu-
nications Companies, and Pacific Teles-
is Group; Iowa Utilities Board; North
American Telecommunications Associ-
ation ("NATA"), Petitioners–Inter-
venors,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Respondent,

American Telephone and Telegraph, et
al., Respondents–Intervenors.

STATE OF MICHIGAN; Michigan
Public Service Commission,
Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

MCI TELECOMMUNICATIONS
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Nos. 87–7230, 87–7233, 87–7265, 87–7361,
87–7362, 87–7441 and 87–7451.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 12, 1989.

Withdrawn from Submission
Jan. 27, 1989.

Resubmitted April 28, 1989.

Decided June 6, 1990.

James S. Blaszak and Charles C. Hunter, Heron, Burchette, Ruckert & Rothwell, Washington, D.C., for the Ad Hoc Telecommunications Users Committee.

Joseph P. Markoski and Herbert E. Marks, Squire, Sanders & Dempsey, Washington, D.C., for the ADAPSO.

James H. Wallace, Jr., Wiley, Rein & Fielding, Washington, D.C., for the American Newspaper Publishers Ass'n.

Wayne V. Black, C. Douglas Jarrett and Mary Chambers Grandy, Keller & Heckman, Washington, D.C., for the American Petroleum Institute.

Francine J. Berry and David P. Condit, American Telephone and Telegraph Co., Basking Ridge, N.J.; David W. Carpenter and Cynthia A. Gray, Sidley & Austin, Chicago, Ill.; Howard J. Rubinoit, Sidley & Austin, Los Angeles, Cal.; Jonathan S. Hoak, Sidley & Austin, Washington, D.C., for the American Telephone and Telegraph Co.

Alfred Winchell Whittaker, Kirkland & Ellis, Washington, D.C.; Floyd S. Keene and JoAnne G. Bloom, Ameritech, Chicago, Ill., for the Ameritech Operating Companies.

Arthur H. Stuenkel, Arkansas Public Service Com'n, Little Rock, Ark., for the Arkansas Public Service Com'n.

Gary M. Epstein and Aileen R. Amarandos, Latham & Watkins, Washington, D.C.; Mark J. Mathis, James R. Young, and Lawrence W. Katz, Bell Atlantic, Washington, D.C., for Bell Atlantic.

William B. Barfield and R. Frost Branon, Jr., BellSouth Corporation, Atlanta, Ga., for the BellSouth Corp.

Henry D. Levine and Brant S. Karstetter, Morrison & Foerster, Washington, D.C., for the California Bankers Clearing House Ass'n and the New York Clearing House Ass'n.

Janice E. Kerr, J. Calvin Simpson, and Ellen S. LeVine, California Public Utilities Com'n, San Francisco, Cal., for the California Public Utilities Com'n and the People of the State of Cal.

Theodore D. Frank and Vonya B. McCann, Arent, Fox, Kintner, Plotkin and Kahn, Washington, D.C., for the Centel Corp.

Jonathan Canif and Randolph J. May, Bishop, Cook, Purcell & Reynolds, Washington, D.C., for CompuServe.

Peter B. Kenney, Jr., Baker & Hostetler, Washington, D.C.; John S. Voorhees, Howrey & Simon, P.C., Washington, D.C., for the Computer and Business Equipment Mfrs. Ass'n.

John C. Wohlstetter, Contel Corp., Washington, D.C., for the Contel Corp.

Howard C. Davenport, District of Columbia Public Service Com'n, Washington, D.C., for the District of Columbia Public Service Com'n.

Philip M. Walker, Electronic Mail Association, Reston, Virginia, for the Electronic Mail Ass'n.

Diane Killory, Gen. Counsel, Daniel M. Armstrong and Associate Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, Nancy E. Stanley, Linda L. Oliver, Laurel R. Bergold and Charles Oliver, Counsel, Federal Communications Com'n, Washington, D.C., for the Federal Communications Com'n.

Gregory J. Krasovsky, Florida Public Service Com'n, Tallahassee, Fla., for the Florida Public Service Com'n.

Alexander P. Humphrey, Gen. Elec. Information Services, Washington, D.C., for General Elec. Information Services.

James P. Denvir, Akin, Strauss, Hauer & Feld, Washington, D.C., for Graphnet, Inc.

James R. Hobson and Daniel L. Bart, GTE Telephone Operating Companies, Washington, D.C.; Richard McKenna, GTE Telephone Operating Companies, Stamford, Conn., for the GTE Telephone Operating Companies.

Marsha H. Smith, Donald L. Howell, Michael S. Gilmore, Idaho Public Utilities Com'n, Boise, Idaho, for the Idaho Public Utilities Com'n.

Herbert E. Marks, Diane J. Cornell, James L. Casserly, and David Alan Nall, Squire, Sanders & Dempsey, Washington, D.C., for the Independent Data Communications Ass'n.

Thomas E. Kieper, Indiana Utility Consumer Counselor, Indianapolis, Ind., for the Indiana Utility Consumer Counselor.

Richard E. Wiley, Robert J. Butler, and Kurt E. DeSoto, Wiley, Rein & Fielding,

Washington, D.C., for the Information Industry Ass'n.

J. Roger Wollenberg, Roger M. Witten, and Andrew D. Roth, Wilmer, Cutler & Pickering, Washington, D.C.; Kevin H. Cassidy, Intern. Business Machines Corp., Purchase, N.Y., for the Intern. Business Machines Corp.

International Transcription Service, Washington, D.C., for the Intern. Transcription Service.

Allan Kniep, Iowa Utilities Bd., Des Moines, Iowa, for the Iowa Utilities Bd.

Richard B. Severy, Ellen G. Block, Jeffrey H. Matsuura, John M. Scorce, MCI Communications Corp., Washington, D.C.; Marc P. Fairman, Morrison & Foerster, San Francisco, Cal., for the MCI Telecommunications Corp.

Peter G. Ballou, Maine Public Utilities Com'n, Augusta, Maine; Joel B. Shufman, Maine Public Advocate, Augusta, Maine, for the Maine Public Utilities Com'n.

Frank J. Kelley, Atty. Gen., Louis J. Caruso, Sol. Gen., Don L. Keskey and Henry J. Boynton, Asst. Attys. Gen., Lansing, Mich., for the State of Mich. and the Michigan Public Service Com'n.

Steven Dottheim, Missouri Public Service Com'n, Jefferson City, Mo., for the Missouri Public Service Com'n.

Paul Rodgers, Charles D. Gray, and Lisa M. Zaina, National Ass'n of Regulatory Utility Com'rs, Washington, D.C., for the National Ass'n of Regulatory Utility Com'rs.

Michael S. Schooler, Brenda L. Fox, and David L. Nicholl, National Cable Television Ass'n, Inc., Washington, D.C., for the National Cable Television Ass'n, Inc.

Robert A. Simpson, Acting Counsel for the New York Public Service Com'n, Albany, N.Y., for the New York State Dept. of Public Service.

Saul Fisher and Richard G. Warren, NYNEX, White Plains, N.Y., for the NYNEX Telephone Companies.

Albert H. Kramer and Denise Bonn, Wood, Lucksinger & Epstein, Washington, D.C., for the North American Telecommunications Ass'n.

James P. Tuthill, Margaret deB. Brown, and Betsy S. Granger, San Francisco, Cal.; Stanley J. Moore, Washington, D.C., for Pacific Bell, Nevada Bell, the PacTel Communications Companies, and the Pacific Telesis Group.

Mary L. Vanderpan, South Dakota Public Utilities Bd., Pierre, S.D., for the South Dakota Public Utilities Bd.

Michael J. Zpevak, Southwestern Bell, St. Louis, Mo., for Southwestern Bell.

Philip M. Walker, Telenet Communications Corp., Reston, Va.; Donald E. Ward, Ward & Mendelsohn, P.C., Washington, D.C., for the Telenet Communications Corp.

Stephen R. Bell, Squire, Sanders & Dempsey, Washington, D.C., for the Tymnet–McDonnell Douglas Network Systems Co.

Richard L. Thornburgh, U.S. Atty. Gen., Charles Rule, Andrea Limmer, Catherine G. O'Sullivan, Nancy Garrison, and Barry Grossman, Washington, D.C., for the U.S.

Martin T. McCue, Telephone Ass'n, Washington, D.C.; Randall B. Lowe, Jones, Day, Reavis & Pogue, Washington, D.C., for the U.S. Telephone Ass'n.

Dana A. Rasmussen and Robert B. McKenna, U.S. West, Washington, D.C., for U.S. West.

Charles M. Meehan, Shirley S. Fujimoto, and Nina M. Binstein, Keller & Heckman, Washington, D.C., for the Utilities Telecommunications Council.

Steven M. Schur and Robert J. Mussallem, Public Service Com'n of Wisconsin, Madison, Wis., for Wisconsin Public Service.

Margery F. Baker and Kathryn C. Brown, of Counsel for Robert A. Simpson, Acting Counsel for New York Public Service Commission.

Before FARRIS, BOOCHEVER and NORRIS, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Petitioners invoke our jurisdiction under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a) to review orders of the Federal Communications Commission issued in a rulemaking proceeding known in the telecommunications industry as the *Third Computer Inquiry* or *Computer III*.[1] Petitioners dispute two discrete rulings by the Commission. First, petitioners challenge the ruling that the divested Bell Operating Companies (BOCs) no longer be required to maintain corporate separation between their common carrier communications services, which are regulated under tariff pursuant to Title II of the Federal Communications Act,[2] and the unregulated provision of enhanced or data processing services over the telecommunications network.[3] Petitioners contend that the Commission's decision to permit the BOCs to integrate their regulated and unregulated activities, violates section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because it is arbitrary and capricious.

Second, petitioners challenge the Commission's decision to preempt state regulation of communications common carriers'

provision of enhanced services on the ground that it violates section 2(b)(1) of the Communications Act, which denies the Commission jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier...." 47 U.S.C. § 152(b)(1).

## I

## BACKGROUND

By the 1960s, the growing interdependence of the telephone and the computer created regulatory problems for the Federal Communications Commission. Increasingly, providers of data processing services, such as IBM, were using the transmission facilities of communications common carriers to deliver computer-based information to customers' terminals. An entire new industry based upon the rapidly advancing technology of both the telephone and the computer took root and flourished. Because the provision of enhanced services—as the FCC has labeled telecommunications services combining both data process-

---

**1.** The orders under review are: *Report and Order, In re Amendment of Sections 64.702 of the Commission's Rules and Regulations* (*Third Computer Inquiry*) (Docket No. 85–229), 104 F.C.C.2d 958 (1986) (*Phase I Order*), *on reconsideration,* 2 FCC Rcd 3035 (1987) (*Phase I Reconsideration*); 2 FCC Rcd 3072 (1987) (*Phase II Order*). The FCC on February 18, 1988, released an order on further reconsideration of the *Phase I Order, Memorandum Opinion and Order on Further Reconsideration, In re Amendment of Sections 64.702 of the Commission's Rules and Regulations* (*Third Computer Inquiry*), 3 FCC Rcd 1135 (1988) (*Phase I Further Reconsideration*); and an order on reconsideration of *Phase II Order, Memorandum Opinion and Order on Reconsideration, In re Amendment to Sections 64.702 of the Commission's Rules and Regulations* (*Third Computer Inquiry*), 3 FCC Rcd 1150 (1988) (*Phase II Reconsideration*). The *Phase II Reconsideration Order* is the subject of a petition for review before the District of Columbia Circuit, *BellSouth Corp. v. FCC,* D.C. Circuit No. 88–1303 (filed April 20, 1988), and a separate petition for review in this court, *People of California v. FCC,* Ninth Circuit No. 88–7183 (filed May 13, 1988).

**2.** The FCC has authority to regulate interstate telecommunications pursuant to the Communi-

cations Act of 1934, 47 U.S.C. §§ 151–613 (1982 & Supp.1987) ("Communications Act" or "Act").

**3.** Throughout this opinion we use the FCC's terms "basic" and "enhanced" to distinguish between regulated common carrier communications services, which consist largely of plain old telephone service (POTS), and unregulated data processing services which use the telephone network to convey information from remote computers to customers' terminals. In the FCC's formal terms, basic service is the offering of a "pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." *Final Decision, In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry),* 77 F.C. C.2d 384, 420 (1980) (*Computer II Final Decision*). An enhanced service combines basic service with "computer processing applications [that] ... act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different or restructured information, or involve subscriber interaction with stored information. *Id.* at 387; *see also* 47 C.F.R. § 64.702(a) (1989). Database services, in which a customer dials a number to obtain access to stored information, such as Dow Jones News, Lexis, and "Dial It" sports scores, are examples of enhanced services.

ing and communications components [4]—involves the use of the transmission facilities of communications common carriers, some argued that the Commission was statutorily required to regulate the new industry. The Commission rejected that argument in favor of a regulatory policy of promoting competition in the enhanced services industry notwithstanding the fact that enhanced services contained regulated communications as well as an unregulated data processing component.

The decision to foster a competitive enhanced services industry did not fully resolve the Commission's regulatory problems. The Commission remained concerned that communications carriers would use their telephone exchange monopolies to obtain leverage in the competitive enhanced services market. First, because non-carrier providers of enhanced services were required to obtain access to the telecommunications network through local exchange "bottlenecks," [5] the Commission was concerned that carriers would gain an unfair competitive edge by discriminating in favor of their own enhanced service offerings in providing access. Second, the Commission was concerned that carriers would exploit their exchange monopolies by passing on to telephone ratepayers costs properly attributable to their unregulated enhanced services business. Such improper cost-shifting effectively subsidizes a carrier's unregulated activities with monopoly profits from its regulated activities, to the detriment of both its monopoly ratepayers and its competitors in the enhanced services market. The two *Computer III* orders we review in this case represent a culmination of a long history of FCC attempts to guard against these potential abuses of communications carriers' monopoly power.

A. *The First and Second Computer Inquiries*

In the *First Computer Inquiry (Computer I)*,[6] the FCC considered for the first time the appropriate regulatory treatment of telephone company participation in the newly emerging, competitive industry of delivering data processing services over telephone lines. The Commission required that any telephone carrier offering such enhanced services do so by means of a separate corporate subsidiary. The structural separation requirement was applied to all carriers with annual revenues exceeding $1,000,000, although the Commission never explained why it drew its regulatory line at the $1,000,000 mark. Structural separation was not initially regarded as applying to the American Telephone & Telegraph Company (AT & T) and its local exchange affiliates (the Bell System), because those companies were thought to be barred from offering data processing services by a 1956 antitrust consent decree. *United States v. Western Elec. Co.*, 1956 Trade Cas. (CCH) ¶ 68,246 (D.N.J. Jan. 24, 1956); *see GTE Serv. Corp.*, 474 F.2d at 730 n. 7.

In its 1980 *Second Computer Inquiry (Computer II)* decision,[7] the FCC redefined regulated communications services and unregulated data processing. By creating a regulatory distinction between "basic" and "enhanced" services, the Commission sought to draw a bright line between activities that would be regulated as common carrier offerings and those that would not. *See Computer II Final Decision*, 77

**4.** *See supra* note 3.

**5.** Local telephone exchanges are dubbed "bottlenecks" because they generally provide the sole access to the telecommunications network.

**6.** *Tentative Decision of the Commission, In re Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities (First Computer Inquiry)*, 28 F.C.C.2d 291 (1970) (*Computer I Tentative Decision*); *Final Decision and Order, In re Regulatory and Policy Problems Presented by the Interdependence of Computer and Communica-tion Services and Facilities (First Computer Inquiry)*, 28 F.C.C.2d 267 (1971) (*Computer I Final Decision*), aff'd in part and rev'd in part, *GTE Serv. Corp. v. FCC*, 474 F.2d 724 (2d Cir.1973).

**7.** *Computer II Final Decision, supra* note 3; *on reconsideration* 84 F.C.C.2d 50 (1980) (*Computer II Reconsidered Decision*); 88 F.C.C.2d 512 (1981) (*Computer II Further Reconsidered Decision*), aff'd, *Computer & Communications Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).

F.C.C.2d at 423, 428–30, 438–47. In *Computer II*, the FCC also preempted state regulation of the sale of both customer premises equipment (CPE)[8] and enhanced services.

Although the FCC in *Computer II* continued to rely on structural separation as the principal means of preventing cross-subsidization and discriminatory access, it restricted the requirement to members of the Bell System and removed it from all other carriers regardless of whether their revenues exceeded $1,000,000.[9] Thus only AT & T and its operating subsidiaries were required to form separate corporate subsidiaries to provide enhanced services.[10] The Commission's decision to switch from regulating all carriers with revenues in excess of $1,000,000 to regulating only AT & T apparently went unchallenged. The FCC attempted to predicate the need for regulation on a carrier's national market power, which only AT & T had. However, the Commission neither defined the "national market" at issue nor explained why it drew its regulatory line between national market power and substantial regional market power such as that enjoyed by GTE Service Corporation (GTE) and Continental Telephone. The FCC again stressed the importance of a carrier's monopoly control of local bottleneck facilities and the ability to abuse that control either by providing inferior access to competitors or by cross-subsidizing its own enhanced services with monopoly revenues derived from captive ratepayers. *Computer II Final Decision*, 77 F.C.C.2d at 466–68.

## B. *The Breakup of AT & T*

On January 1, 1984, AT & T divested itself of its 22 local exchange telephone companies—the Bell Operating Companies or "BOCs"—as part of a settlement of the government's 1974 antitrust suit against AT & T. *United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *see also United States v. Western Elec. Co.*, 569 F.Supp. 990 (D.D.C.1983); *United States v. Western Elec. Co.*, 569 F.Supp. 1057 (D.D.C.) *aff'd*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). Upon divestiture, the 22 BOCs were grouped into seven independent regional holding companies.[11] The district court retained jurisdiction to approve implementation of the MFJ,[12] to enforce its terms, and to entertain future

---

**8.** Customer premises equipment includes all terminal equipment kept on subscriber premises, ranging from ordinary telephones to computerized switchboards.

**9.** These rules are set forth at 47 C.F.R. § 64.702(c), (d) (1987). *See also Computer II Final Decision*, 77 F.C.C.2d at 475–88; *Computer II Reconsidered Decision*, 84 F.C.C.2d at 71–86; *Computer II Further Reconsidered Decision*, 88 F.C.C.2d at 542–47.

AT & T remained subject to the 1956 antitrust consent decree when the FCC adopted *Computer II*. That decree had limited AT & T essentially to the provision of services that were "subject to regulation." *Western Elec.*, 1956 Trade Cas. (CCH) ¶ 68,246, at 71,137. The FCC expressed its belief in the *Computer II* decision that the 1956 decree did not bar AT & T from the offering of CPE and enhanced services on a separated basis insofar as those offerings were "subject to regulation" by the FCC. Thus, by subjecting AT & T (but no other carrier) to structural separation requirements, the FCC was arguably doing AT & T a favor by subjecting its CPE and enhanced services to regulation and thereby freeing AT & T to engage in those businesses without violating the 1956 consent decree. The 1956 decree was later vacated as part of the settlement of the 1974 government antitrust case against AT & T, and the pertinent restriction in the 1956 decree no longer was applicable. *Computer & Communications Industry v. FCC*, 693 F.2d at 220.

**10.** Initially, the FCC required GTE to offer enhanced services through a separate subsidiary; however, on reconsideration, the Commission released GTE from the requirement. *See Computer II Reconsidered Decision*, 84 F.C.C.2d at 72–75. We discuss the Commission's treatment of GTE in detail in our analysis section because the Commission's haphazard treatment of GTE illustrates the ad hoc nature of its reasoning over the course of the four major rulemaking proceedings that have examined the relationship between data processing and basic telephone service.

**11.** Unless otherwise indicated, we refer in this opinion to the regional holding companies and their wholly-owned telephone companies indiscriminately as the "BOCs."

**12.** The settlement agreement, as modified by the district court, is referred to as the Modified Final Judgment or "MFJ."

requests for removal or modification of the decree's restrictions.

Under the MFJ, AT & T retained its long-distance telephone operations, its CPE manufacturing business, and Bell Laboratories. AT & T, now divested of the BOCs, was free to enter virtually all other facets of the marketplace, including data processing. The divested BOCs were restricted generally to providing local exchange telephone service and other "natural monopoly service[s] actually regulated by tariff." 552 F.Supp. at 227–28. Under the MFJ, the BOCs could not provide inter-exchange telephone service, or offer "information services," a category that substantially overlaps, but may not be identical to, the FCC's "enhanced services."[13] *Id.* at 227.

The antitrust court initially left open the question whether the BOCs should conduct their unregulated activities through separate corporate subsidiaries. In accepting the MFJ, the court found that issue more appropriately a concern of regulatory agencies such as the FCC. 552 F.Supp. at 193 n. 251. In a subsequent order, the antitrust court imposed corporate separation as a condition on the grant of waivers that permitted a company to engage in non-communications-related activities. *United States v. Western Elec. Co.*, 592 F.Supp. 846, 870–71 (D.D.C.1984), *appeal dismissed*, 777 F.2d 23 (D.C.Cir.1985). In 1988, the antitrust court permitted the BOCs to offer voice messaging services,

voice storage and retrieval and electronic mail services—all of which are enhanced services under the FCC's definitions. *United States v. Western Elec. Co.*, 714 F.Supp. 1, 22 (D.D.C.1988), *aff'd in part, rev'd on other grounds*, 900 F.2d 283 (D.C. Cir.1990) (per curiam).

### C. *The BOC Separation Order*

In preparation for the January 1984 restructuring of the Bell System, the FCC opened a proceeding to determine whether and how the *Computer II* rules should be applied to the divested BOCs.[14] In its *BOC Separation Order*, the FCC stressed that the BOCs enjoyed the same monopoly power through their ownership of the local exchanges that AT & T had long enjoyed. The Commission noted that the seven regional BOCs, although smaller than AT & T, remained titans in the telecommunications industry.[15] The divestiture of AT & T did not eliminate the Bell System's control over local exchange facilities; it simply transferred that control from a single national company to seven regional BOC holding companies. Throughout its order, the FCC insisted that the BOCs' monopoly power and control over the local exchange bottlenecks would give them both the incentive and the ability to cross-subsidize and to provide inferior network access to enhanced services competitors. *BOC Separation Order*, 95 F.C.C.2d at 1125–39.

---

**13.** The MFJ defines "information services" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications...." MFJ Section IV(J), 552 F.Supp. at 229.

**14.** *Notice of Proposed Rulemaking, In re Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies*, 93 F.C.C.2d 722 (1983); *Report and Order, In re Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies*, 95 F.C.C.2d 1117 (1983) (*BOC Separation Order*), *aff'd sub nom. Illinois Bell Tel. Co. v. FCC*, 740 F.2d 465 (7th Cir.1984), *recon. denied*, 49 Fed.Reg. 26,056 (June 26, 1984), *aff'd*

*sub nom. North American Telecommunications Ass'n v. FCC*, 772 F.2d 1282 (7th Cir.1985).

**15.** The dissent characterizes the regional holding companies as "the smaller local BOCs." Dissent at 5788. According to the FCC, however, the post-divestiture BOCs still possess

> concentrated control over monopoly bottleneck facilities in large, contiguous geographic areas. The ... [BOCs] will own bottleneck facilities in virtually every major and medium-sized metropolitan and industrial area in the country: In contrast, even the largest of the independents, GTE, controls bottleneck facilities in mostly rural, widely scattered areas.

*BOC Separation Order*, 95 F.C.C.2d at 1138–39. At the time of the *Separation Order*, the formation of the BOCs did not appear to have diluted AT & T's monolithic power. *Id.*

In the *BOC Separation Order* rulemaking proceeding, the BOCs argued that divestiture had eliminated the need for *Computer II*'s structural separation requirements. The FCC rejected this argument because the BOCs had inherited AT & T's monopoly power and control over access to the telecommunications network. In the Commission's view, the critical fact was that each BOC would retain ownership of the local exchange monopolies in the region in which it operated. As the Seventh Circuit observed in approving the FCC's order:

> It is still the case, no less than before the divestiture, that if you want to have telephone service and are located in an area served by a Bell operating company you must get your access line from that company. Hence the operating companies have monopolies of basic telephone service in many important markets....
>
>    ....
>
> ... The basic source of AT & T's monopoly power was not the manufacture of telecommunications equipment or even the ownership of the nation's long-distance lines; it was the operating companies' control of access to the telecommunications network. The inheritors of the Bell monopoly are the [BOCs].... The worst bottlenecks in this industry are local.

*Illinois Bell*, 740 F.2d at 471, 473. Such bottleneck control, in the Commission's view, created the same danger of anticompetitive activity that existed before divestiture. *BOC Separation Order*, 95 F.C.C.2d at 1134–35.

The FCC also determined in its order that non-structural regulations on BOC cost-accounting and network-access practices would be ineffective safeguards against anticompetitive behavior by the BOCs. Absent a structural separation rule, the FCC found, the BOCs could install their own enhanced services equipment within the local networks, and would be free to market enhanced services through the same organizations used for basic telephone service. For example, the FCC found that

> if joint marketing were permitted, the personnel who contact customers to market regulated services could be selling ... enhanced services at the same time. Difficult, sometimes impossible, problems of fairly allocating the costs of marketing between regulated and unregulated accounts would again occur.

*BOC Separation Order*, 95 F.C.C.2d at 1130. This integrated operation of regulated and unregulated activities would, in the FCC's words, be "impossible" to monitor for cross-subsidization. *Id.* The Commission found that accounting regulations were insufficient to ensure that the BOCs were properly allocating the costs of providing each service in the charges passed on to consumers. Because the services were so closely related, the Commission reasoned, the BOCs could easily reclassify enhanced services costs or joint costs as basic telephone service costs, without being detected by the FCC. *See BOC Separation Order*, 95 F.C.C.2d at 1130–31. For the same reason, the Commission rejected the BOCs' argument that state regulatory commissions, which set rates for intrastate basic telephone services, could effectively prevent improper cost-shifting to ratepayers. Because state ratemaking, like FCC ratemaking, is based on the cost of providing service, state regulators would encounter the same difficulties as the FCC in determining whether a BOC was properly allocating costs between enhanced services and basic telephone service. *See id.* at 1130–31.

Analogous enforcement problems, in the FCC's view, would beset efforts to use network-access rules to assure that the BOCs would not provide inferior access to competitors. Because of the BOCs' exclusive control over the connection and switching equipment of the local exchanges, it would be difficult for the Commission to know whether the BOCs were providing competitors with transmission services of comparable quality at comparable prices. By integrating their enhanced services equipment into the telephone network, the BOCs could favor their own enhanced services with superior signals and switching capacities without being detected. The BOCs could also engage in subtle tie-in practices in which they conditioned the

availability of transmission services on the purchase of their own enhanced services or equipment. *See id.* at 1135.

In contrast, the FCC found that structural separation continued to be an effective means of preventing cost-shifting and discrimination. It viewed structural separation as essentially a prophylactic measure. The separate subsidiary requirement forces the BOCs to produce and market enhanced services independent of basic telephone services, and maintain different books, different staffs, and different equipment premises for each service. This separation eliminates the problem of determining the proper allocation of joint costs, and makes it difficult for the BOCs to masquerade enhanced services costs as basic telephone service costs. *BOC Separation Order,* 95 F.C.C.2d at 1131. It also reduces the chance of discrimination by putting a BOC's enhanced services subsidiary on substantially the same footing as the subsidiary's competitors. Like its competitors, the subsidiary must deal with the BOC at arm's length in purchasing transmission services, and must maintain its enhanced services equipment at a location separate from the BOC's local exchange facilities. The subsidiary thus receives its transmission services along the same telephone lines, and through the same switching systems, as its competitors. In the FCC's words, "[i]f a BOC's separate entity is required to obtain access to the network in the same fashion as would a competing supplier, the provision of inferior access to a BOC rival would be much easier to detect." *Id.* at 1136.

In mandating structural separation, the Commission made clear that its regulations were designed to protect the integrity of two distinct markets—the unregulated market for enhanced services and the regulated market for basic telephone service. In part, the separation requirements were designed to benefit participants in the enhanced services market by creating an even playing field for the BOCs' competitors. If the BOCs were prevented from either cross-subsidizing their own enhanced services or discriminating against the enhanced service offerings of their competitors, then free and fair competition would flourish in the growing industry. *BOC Separation Order,* 95 F.C.C.2d at 1132–37. Structural separation also protected the basic telephone service market by preventing the BOCs from extracting, through cost-shifting, monopoly rents from captive telephone consumers. The "ratepayers"—that is, ordinary telephone customers—would not be forced to subsidize the BOCs' expansion into the data processing business. *See id.* at 1129.

### D. *The Third Computer Inquiry*

In August 1985, just 14 months after concluding the BOC Separation Proceeding, in which the FCC rejected the argument that divestiture had reduced the need for structural separation, the Commission reversed course [16] and announced its intention to relieve the BOCs of the separation requirements.[17] The FCC now reasoned that divestiture and increased competition in the enhanced services market had somehow diminished the value of structural separation as a safeguard against monopoly abuse. The FCC and the dissent attempt to justify this about-face by arguing that divestiture has drastically changed the

---

**16.** *Compare BOC Separation Order,* 95 F.C.C.2d at 1135–36 ("Anticompetitive conduct directed against enhanced service providers can be controlled by structural separation in a manner that may not be effective with accounting separation alone. If a BOC's separate entity is required to obtain access to the network in the same fashion as would a competing supplier, the provision of inferior access to a BOC rival would be much easier to detect. In addition, the design of the network to favor the BOC's own enhanced services would be easier to detect since separate structure could help to reveal any illegal information transfers.") *with Notice of*

*Proposed Rulemaking, Amendment of § 64.702 of the Commission's Rules and Regulations* (*Third Computer Inquiry*), Docket No. 85–229, 50 Fed.Reg. 33,581, 33,584 ¶ 19 (August 20, 1985) (*Notice of Proposed Rulemaking*) ("We tentatively conclude that regulatory protections short of structural separation, can adequately limit the BOCs, even if aggregated regionally, from using their exchange monopolies to obtain leverage in enhanced services.").

**17.** *See Notice of Proposed Rulemaking, supra* note 16.

competitive structure of the telecommunications industry. Some aspects of the industry remain the same, however. For example, the FCC noted in *Computer III* that it could *not* conclude "that the BOCs' motivation to cross-subsidize ha[d] decreased because of these developments." *Phase I Order*, 104 F.C.C.2d at 1010. Furthermore, the FCC provided no record support that any of the so-called changes were relevant to its regulatory task of protecting captive ratepayers and competitors against the damaging effects of cross-subsidization. Nevertheless, the FCC tentatively concluded that the costs of separation now exceeded its public benefits and proposed to replace the requirement with accounting and other nonstructural regulations.[18]

In a *Report and Order* issued June 16, 1986 (*Phase I Order*), the FCC adopted new regulations permitting the BOCs to integrate their basic and enhanced services upon implementation of a plan of nonstructural safeguards approved by the FCC. *Phase I Order*, 104 F.C.C.2d at 1013. The required nonstructural safeguards are described in more detail below.

The FCC decided that its structural separation regulations had imposed costs in terms of the unavailability of certain services, lost economies and efficiencies, and the inability of customers to obtain complete telecommunications and data processing solutions from a single vendor. The FCC also determined that the BOCs' ability to cross-subsidize had been restricted because of divestiture, the growth of competitive alternatives to the BOCs' ordinary telephone service, and political and regulatory pressures at the state level to keep local phone rates down. The BOCs' ability to discriminate by providing inferior network access had also diminished, according to the FCC, because of industry-wide coordination of network standards and the threat that enhanced services competitors could bypass the BOCs' local exchanges. *Phase I Order*, 104 F.C.C.2d at 1007–12. However, the FCC did not address the question of whether divestiture had resulted in a diminution of the power of the surviving regional BOCs to subsidize their unregulated enhanced service operations by shifting costs to monopoly ratepayers.

The FCC concluded that the regulatory goals served by structural separation could be achieved by two nonstructural safeguards.[19] First, the FCC would develop cost allocation methods to minimize the BOCs' ability to shift costs from their unregulated to regulated activities. *Id.* at 1010–11. Second, the FCC adopted regulations specifically designed to prevent the BOCs from using their "substantial market power in providing network access" to discriminate against competing providers of enhanced services. *Phase I Order*, 104 F.C.C.2d at 1026. These antidiscrimination regulations contained three prongs. *First*, the FCC endorsed an open-network policy of requiring the BOCs to make the telephone networks as accessible to competitors as they are to the BOCs themselves.[20] *Second*, each BOC must notify its competitors in the enhanced services industry of changes in the network that may affect the provision of enhanced services so as to permit competitors to take advantage of the changes. *Third*, each BOC must pro-

---

**18.** The FCC did not propose specific accounting procedures and requested comments only "on the overall objectives" of cost allocation. *Notice of Proposed Rulemaking*, 50 Fed.Reg. at 33,591 ¶ 69 n. 53.

**19.** Once again, the FCC did an about-face from its position in the *BOC Separation Order*. Compare *Phase I Order*, 104 F.C.C.2d at 1010 ("[W]e conclude that the benefits of structural separation in protecting ratepayers and the enhanced services market from potential anticompetitive practices by the BOCs are not significantly greater than such benefits provided by the nonstructural safeguards.") *with BOC Separation Order*, 95 F.C.C.2d at 1131 ("[A]ccounting, alone, cannot provide the public with as much protection against improper cost-shifting as structural separation can.").

**20.** There are two components to this open-network policy: CEI (for "Comparably Efficient Interconnection"), which means each BOC must, pending more permanent changes, provide competitors with connections to the local exchange network that are equal to the connections available to the BOCs' own enhanced services; and ONA (for "Open Network Architecture"), which means each BOC must ultimately incorporate CEI concepts into the overall design of its basic service network.

vide its competitors with information about customer use of the telephone network so that the competitors may design their services to suit customer needs.

## II

### THE APA ISSUE

Petitioners claim that it was irrational for the FCC to abandon structural safeguards so soon after imposing them on AT & T in *Computer II* and reimposing them on the divested BOCs in the *BOC Separation Order*. Structural safeguards, argue petitioners, have been the Commission's primary weapon for preventing anticompetitive conduct such as cross-subsidization and discriminatory access, and these safeguards, which were originally imposed in *Computer I* on all communications carriers with assets of over $1,000,000, are a longstanding FCC rule which was abandoned without a reasoned agency decision.

The FCC counters by characterizing structural safeguards as a transitional measure imposed on the BOCs to cushion the effects of AT & T's divestiture. FCC Brief at 97 n. 148. Furthermore, the Commission argues that it announced at the time of the *BOC Separation Order* that it would refine its separation requirements as it gained experience with BOC offerings. *Id.* (citing *BOC Separation Order*, 95 F.C. C.2d at 1140, 1127–28). The FCC vigorously disputes petitioners' claim that it has abandoned any past policy and insists that it is required to reevaluate its policies in light of changed circumstances. *WWHT, Inc. v. FCC*, 656 F.2d 807, 819 (D.C.Cir. 1981); *Geller v. FCC*, 610 F.2d 973, 980 n. 59 (D.C.Cir.1979).

We recognize that the FCC is obligated to reevaluate its policies when circumstances affecting its rulemaking proceedings change. We also recognize that the Commission has broad discretionary authority to change its regulatory mind. But the Commission cannot expect us simply to rubberstamp its change in policy. Although we respect the Commission's exercise of discretion in an area in which it has expertise, we cannot, as a reviewing court,

accept an agency's change of course uncritically. Section 10(e) of the APA requires us to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The FCC explains its lifting of the structural separation requirements by arguing that certain developments in telecommunications markets and technologies have materially changed circumstances in the industry. Specifically, the FCC asserts that technological advances, political and regulatory pressure by the states, divestiture, and a generally competitive enhanced services market have reduced the risks of both cross-subsidization and discriminatory access.

Section 10(e) of the APA requires us to determine whether the Commission's decision was a reasonable exercise of its discretion, based on consideration of relevant factors, and supported by the record. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43–44, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (*State Farm*). The scope of review under this standard is a narrow one: we are not to substitute our judgment for that of the Commission in making policy choices as to how to carry out its statutory mission. While our standard of judicial review is highly deferential, it may not be uncritical. Under the APA, an agency's discretion is not boundless, and we must satisfy ourselves that the agency examined the relevant data and articulated a satisfactory explanation for its action based upon the record. We must find agency action to be in violation of the APA if the agency has "failed to consider an important aspect of the problem" or has "offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* at 43, 103 S.Ct. at 2866; *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

We stress that petitioners' contention that the FCC violated § 10(e) of the APA when it allowed the BOCs to integrate their regulated and unregulated ac-

tivities requires judicial scrutiny of the cost/benefit analysis that is at the heart of the FCC decision. Especially in a rulemaking proceeding as economically and technologically complex as *Computer III*, this scrutiny is a daunting task. Nonetheless, because the FCC relied on a cost/benefit analysis, we must decide whether the FCC's evaluation of the costs and benefits it has identified as relevant finds support in the administrative record. While we scrutinize the FCC's evaluation of each individual cost and benefit, we make no attempt to exercise the judgment required in striking the balance between the competing costs and benefits. That balancing is a matter that must be left to the discretion of the FCC. But if the FCC's evaluation of any significant element in the cost/benefit analysis lacks record support, we cannot uphold the agency action under § 10(e). Thus, we must be satisfied that the Commission's assessment of the various costs and benefits is reasonable in light of the administrative record.

■ We note further that we are limited in our evaluation to the reasons the FCC gave; we cannot supply our own rationale. According to the Commission, technological advances and market changes have made it possible for nonstructural safeguards, such as cost accounting, to protect ratepayers from cost-shifting and competitors from both cost-shifting and inferior access. We thus address the question of whether the record supports the FCC's finding that the individual costs and benefits of structural separation have been materially affected by changed circumstances.

### A. *The Costs of Structural Separation*

■ Throughout the various *Computer* rulemaking proceedings, the FCC has recognized that the protective benefits of structural separation do not come free of cost. *See, e.g., BOC Separation Order*, 95 F.C.C.2d at 1137–38. In appraising the social costs of structural separation, the FCC found in *Computer III*, as it had found in prior proceedings, that separation has discouraged innovation in developing and marketing new enhanced services technologies,

has prevented the BOCs from providing customers with efficient packages of basic and enhanced services, and has generally created inefficiencies by forcing the BOCs to maintain duplicate organizations and facilities. The FCC made no finding that the costs of these inefficiencies were any greater at the time of *Computer III* than they were at the time of *Computer II* and the *BOC Separation Order*. Nor do we see any basis in the record for such a finding. Nonetheless, the FCC contends that its experience under the *Computer II* regime has provided it with more evidence that these social costs are significant. Even though the record support is marginal, we hold that it suffices to support an administrative finding that the BOCs have had to raise the price of certain services, withhold others from the market, and perhaps never develop still others because of the inefficiencies of structural separation.

The Commission makes a fair case that the integration of regulated and unregulated telecommunications services by the BOCs would yield some economies of scale. On the technological side, the BOCs could integrate enhanced services equipment more closely into the telephone network. On the marketing side, the BOCs could offer customers—particularly business customers—packages of basic and enhanced services. These packages would minimize transaction costs, and reduce delays and coordination problems in satisfying consumer demands. Moreover, the BOCs would not have to maintain, and customers would not have to pay for, separate organizations and facilities for operating and repairing basic and enhanced services. *See Phase I Order*, 104 F.C.C.2d at 987–89.

While the Commission concludes that these costs are "potentially very significant," it makes no attempt to quantify them. *Id.* at 1008. The Commission asserts that it has had several years since *Computer II* in which to study the costs of structural separation. We recognize that the Commission now enjoys the benefit of additional experience with structural separation; however, the Commission makes no showing that this experience proves that the costs of separation have increased. In

the absence of concrete data, the Commission has relied on vague generalizations offered by the BOCs, *see id.* at 987–89, which makes us hesitate to give great weight to the FCC's "potentially very significant" assessment. Nonetheless, the BOCs' submissions provide an adequate, if marginal, basis for concluding that experience shows that *some* economies of scale would result from integrating basic and enhanced operations.

The FCC makes a plausible case that its separation requirements have impeded the marketing and even development of some new forms of enhanced services. The Commission invokes the example of the Custom Calling II VMS (voice message system), which AT & T developed in the early 1980s. AT & T unsuccessfully sought a waiver from the *Computer II* structural separation rules so it could market the system through its local exchange operating companies. The result, according to the Commission, is that neither this system nor any substantial equivalent has been available to the public. *Phase I Order,* 104 F.C.C.2d at 1008. The record contains other examples of this problem, although the examples are neither detailed nor systematic. The *Computer III* record is replete with BOC assertions that because their ownership of the local exchanges gives them control of access to the telecommunications network, they are best situated to develop and market products that take full advantage of the network's capabilities. Yet the only concrete example in the record is the voice message system cited by AT & T.

Although we are concerned that the rulemaking record fails to indicate the magnitude of the costs of structural separation, we recognize that the FCC necessarily must speculate about the extent to which releasing the BOCs from the handicap of separate operations will create a more vigorous enhanced services market. Because the BOCs have never had an opportunity to offer enhanced services in a deregulated environment, the real benefits, if any, of integrated operations may not be quantifiable at this time. We therefore conclude that the FCC could reasonably decide on this record that structural separation impairs the BOCs' ability to achieve certain economies of scale and has impeded the development and marketing of some new forms of enhanced services. The record, however, yields no evidence that the costs of separation have increased as a result of changed circumstances following *Computer II* and the *BOC Separation Order.* The regulatory experience has merely confirmed that these costs are "potentially very significant." *Phase I Order,* 104 F.C.C.2d at 1008.

### B. *The Benefits of Structural Separation*

The FCC has consistently identified the social benefits of structural separation as safeguarding against the twin evils of discriminatory access and cross-subsidization. Guarding against these improper and anticompetitive practices has always been the Commission's chief concern in promoting its goal of protecting both captive ratepayers and enhanced services competitors of communications carriers. In *Computer III,* the Commission found that changed technological and market circumstances had reduced the need for structural separation as a safeguard against access discrimination and cross-subsidization of the BOCs' own enhanced services with monopoly revenues derived from ratepayers. The FCC cites as changed circumstances a more competitive enhanced services market, technological advances that include an increased ability to detect discriminatory access and the growth of opportunities to bypass local exchanges, increased state political and regulatory pressures, and the AT & T divestiture of the Bell Operating Companies. We therefore consider whether the record supports the FCC's conclusion that these changed circumstances have reduced the value of structural separation, thereby justifying the substitution of nonstructural for structural safeguards.

### (1) Prevention of Discriminatory Access

The FCC found that technological and market developments in the last few years have reduced the danger that the BOCs will discriminate against their competitors

in providing access to the telephone network. We agree that the Commission could reasonably decide that changed circumstances have made it more difficult for the BOCs to provide competitors with inferior access.

The FCC could reasonably conclude that the emergence of powerful competitors such as IBM, which have the resources and expertise to monitor the quality of access to the network, reduces the BOCs' ability to discriminate in providing access to their competitors. The record also supports the proposition that these large corporate competitors—unlike the average telephone user—have a growing capability of bypassing local exchanges by using microwave systems or cable networks for linking their computers with their customers' terminals.

Moreover, the network-access policies that the FCC proposes to substitute for structural separation involve new technologies for detecting inferior access that have not previously been available. The FCC's policy of Comparably Efficient Interconnection (CEI) is designed to ensure that each BOC will provide competitors with connections to the local exchange that equal the connections available to the BOCs' own enhanced services offerings. Moreover, the Open Network Architecture (ONA) policy requires each BOC to incorporate CEI concepts into the overall design of its basic service network. Thus, the record supports the Commission's finding that technologies for ensuring equal access have improved, and may be effective in preventing discrimination in ways not feasible in the past.

### (2) Prevention of Cross–Subsidization

We cannot agree, however, that there is adequate record support for the Commission's conclusion that changed circumstances have reduced the danger that the BOCs will effectively subsidize their competitive activities with monopoly revenues improperly derived from captive ratepayers. The FCC points to four changes in the telecommunications market that allegedly have reduced this danger following *Computer II* and the *BOC Separation Order:* (1) the enhanced services market has become "extremely competitive"; (2) the growth of "bypass" and other alternatives to local exchange facilities has eroded the BOCs' monopoly power; (3) political and regulatory forces at the state level exert pressure on the BOCs to keep the price of basic telephone service down; and (4) divestiture has dissipated the monolithic power of the Bell System. Given these changes, the FCC asserts that nonstructural safeguards such as accounting controls may be substituted for structural separation requirements without increasing the risk of cross-subsidization.

From our review of the administrative record, we hold that the evidence fails to support the FCC's finding that changed market and technological circumstances have significantly diminished the risk of undetected cost-shifting by the BOCs. Nor do we find any record support for the FCC's abandonment of its original position that cost-accounting regulations are relatively ineffective means of preventing improper cost-shifting. We note in this regard that the FCC mischaracterizes the record when it argues that its reliance on cost accounting to detect cost-shifting does not depart from past policy. FCC Brief at 104. The Commission concedes that it has "concluded [in past proceedings] that cost allocation *alone* would be insufficient to protect against cost-shifting." *Id.* The FCC denies, however, that in *Computer III* it is relying solely on cost accounting regulations as a safeguard against cross-subsidization.

> [The FCC] is relying on cost accounting as one element of its overall scheme, the efficacy of which must be viewed with other *Computer III* requirements. As the Justice Department noted in its comments, 'regulatory mechanisms, that by themselves may be insufficient to prevent a regulated bottleneck monopolist from impeding competition in related markets, may, in conjunction with an open architecture network, significantly reduce the risk of anticompetitive harm.'

*Id.* at 105 (citation omitted). This argument is to no avail because it obscures the distinction between regulatory protections

against discriminatory access and regulatory protections against cost-shifting. Open Network Architecture, for example, does nothing to detect or deter cost-shifting; it only guards against inferior access. Thus, we must reject the Commission's assertion that it did not depart from past policy in *Computer III* when it relied heavily on cost accounting regulations to detect cost-shifting. We can only conclude that this position taken in *Computer III* represents an unexplained change from the FCC's original position. We agree with the FCC that it has broad discretion to implement reasonable policy changes. But as the Supreme Court has said, " '[A]n agency's view of what is in the public interest may change.... But an agency changing its course must supply a reasoned analysis.' " *State Farm*, 463 U.S. at 57, 103 S.Ct. at 2874 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970)).

The Commission does not explain how the fact that the enhanced services market is "extremely competitive" reduces the BOCs' ability to cross-subsidize their unregulated enhanced services businesses by misallocating costs to their regulated activities. The BOCs' ability to shift costs derives from the fact that they are monopoly providers of basic telephone service. Because competition in the unregulated *enhanced* services market does nothing to decrease the BOCs' monopoly power in the *basic* services market, we fail to see how it can diminish the BOCs' ability to shift costs to their regulated services without detection in ratemaking proceedings. If anything, increased competition in the enhanced services market simply increases the BOCs' incentive to shift costs so they can engage in predatory price-cutting as a means of maintaining or increasing their share of the market for enhanced services.

The Commission also asserts that the BOCs' monopoly power over the local networks has been "eroded" by new technologies permitting some telephone users to bypass the BOCs' local exchange facilities. These new bypass technologies include "Teleport" fiber networks, cable networks, and microwave systems, all of which enable some circumvention of the local exchanges. The record indicates that such services are available in some metropolitan areas to large business subscribers.

Nynex, for example, listed in considerable detail the bypass technologies currently being employed by major New York banks, and described how other corporate subscribers are interested in developing their own private networks. However, Nynex offered no evidence that these bypass opportunities were widely available to ordinary residential subscribers. Nynex did suggest that some large apartment and condominium buildings in certain metropolitan areas might purchase "shared tenant services" which would enable telephone users to avoid the BOCs' local exchanges, but gave no indication as to the present existence or potential scope of such residential services. Nynex also suggested that corporations maintaining private networks might sell their excess capacity to smaller users who could not afford to purchase microwave systems; but again, it offered no evidence that any such "trickle down" effect actually existed, nor any evidence of how widely available it would be. Moreover, Nynex offered no evidence that the availability of bypass as a theoretical alternative to BOC local exchange service has in any way restricted the ability of the BOCs to inflate basic service prices and cut enhanced service prices through cost-shifting.

Nynex's submission was fairly representative of other commenters' submissions on the question of local bypass. Cincinnati Bell, for example, described how Procter & Gamble and General Electric have constructed their own private telecommunications networks, but offered no evidence of bypass opportunities for residential subscribers.[21] Joint Appendix at 220–22 (Comments of Cincinnati Bell Telephone Compa-

---

**21.** Cincinnati Bell's only discussion of the possibility of residential bypass was a reference to a cable TV vendor's press release announcing its intention to enter the telecommunications mar-

ket sometime in the future. There was no indication of whether and when the vendor would make good on this press release.

ny). Southwestern Bell extolled the fact that "customers can now install a point-to-point microwave system for less than $20,000, excluding multiplexing equipment or tower construction costs," but again offered no evidence that ordinary telephone users were able to bypass the BOCs' local exchanges. Joint Appendix at 424–25 (Comments of Southwestern Bell Corporation). Finally, Ameritech described the range of fiber-optics and microwave networks available to occupants of several large office buildings in Chicago, but gave no examples of existing bypass opportunities for residential customers. Joint Appendix at 565–75 (Reply Comments of the Ameritech Operating Companies). None of these commenters submitted any evidence that bypass has significantly diluted the BOCs' monopoly power in the local exchange markets.

In short, although the record contains an impressive array of evidence demonstrating the technical feasibility of bypass, the record contains no evidence that bypass has become a realistic option for any appreciable number of ordinary telephone users. More importantly, the record is devoid of evidence that the potential for bypass is significant enough to reduce the BOCs' ability, as a practical matter, to exact monopoly rents from basic service customers by burdening them with costs from unregulated activities. On the basis of the record before us, therefore, the FCC's contention that the availability of bypass will hamper BOC attempts at cost-shifting must be characterized as speculative at best. As the court administering the AT & T antitrust MFJ concluded in an opinion contemporaneous with the *Phase I Order*, " 'bottleneck' monopolies continue to exist as before," and "the ability to exploit the bottle-

necks anticompetitively has remained precisely the same." *United States v. Western Elec. Co.*, 627 F.Supp. 1090, 1095 (D.D.C.) *aff'd in part, rev'd on other grounds*, 797 F.2d 1082 (D.C.Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *see United States v. Western Elec. Co.*, 673 F.Supp. 525, 536–40 (D.D.C.1987) (specifically rejecting the contention that bypass has reduced the BOCs' monopoly control over local exchange service) *aff'd in part, rev'd on other grounds*, 900 F.2d 283 (D.C.Cir.1990) (per curiam). Thus, the danger persists that the BOCs can effectively subsidize their unregulated enhanced services business by misallocating costs to ordinary telephone service.[22]

We stress that the relevance of bypass to the issue of cross-subsidization lies in the potential for bypass to become so widespread that monopoly power over local exchange service is materially reduced. Nothing in the record supports such a conclusion. In other words, the record yields no evidence that the BOCs' power to extract monopoly rents from local telephone customers has diminished. In fact, the FCC has never attempted to quantify even in the most broad and general way any such change. To provide anecdotes about specific bypass opportunities without discussing their impact on the BOCs' ability to misallocate costs to ratepayers' revenues confuses the issue. Once again, the Commission fails to distinguish the role of bypass in reducing the risk of discriminatory access from the role of bypass in reducing the risk of cross-subsidization. The record evidence about bypass goes only to a possible reduction in the risk of discriminatory access. The FCC cites to nothing and we know of nothing in the record that even

---

**22.** The dissent points out that the FCC conceded that the development of bypass technologies has not decreased the BOCs' motivation to cross-subsidize. Dissent at 1248–49. The dissent then reminds us that the FCC stated that it did not " 'underestimate the potential danger that BOCs could misallocate costs.' " *Id.* (quoting *Phase I Order*, 104 F.C.C.2d at 1010). The FCC cannot simply assert that it adequately estimated a factor which the record reveals it ignored. The FCC concluded that the danger of BOC cross-subsidization had been dissipated in some sense

by recent developments. As we explain in the text, it relied on unsupported assumptions in reaching that conclusion. The dissent states that the FCC found that the danger of cross-subsidization "had been reduced." Dissent at 1251. In our view the record fails to support that conclusion. The FCC's bald assertion that it exercised its discretion in this area cannot insulate its decision from judicial scrutiny. Even the most deferential review cannot accept an agency's ad hoc reasoning at odds with the record.

begins to show that bypass reduces the BOCs' potential for cost-shifting in any significant way. It is the ability to shift costs to ratepayers that enables communications carriers to subsidize their unregulated activities. We therefore conclude that the evidence of increased bypass opportunities provides no support for a finding that the BOCs' ability to cross-subsidize has been significantly reduced.

Nor does the record yield evidence of any reduction in the BOCs' ability to increase monopoly profits by misallocating costs in seeking rate increases for basic telephone service. The FCC provides us with no basis for deciding when and whether a communications common carrier has the requisite monopoly revenues to engage in such improper cost shifting as a means of subsidizing its unregulated enhanced services business. As a reviewing court, we cannot judge for ourselves whether the BOCs generate sufficient revenues from their local exchange monopolies to pose a serious threat of harm to competition in the enhanced services market. We lack the capacity to make such a determination. Not only has the Commission failed to address the issue of the BOCs' monopoly power, but its decisions in past proceedings about when monopoly revenues are of significant magnitude to merit regulation have been confusingly erratic. In *Computer I,* the FCC originally imposed structural separation requirements on all carriers with annual gross revenues exceeding $1,000,000. In *Computer II,* the Commission relieved all carriers of the separation requirements except one, AT & T.[23] The conversion from a policy of including small carriers with only $1,000,000 in revenues to a policy of excluding all carriers but AT & T has gone both unexplained and unsupported. Frankly, we find no coherence in the Commission's policy shifts in deciding which carriers to sub-

ject to separation requirements.[24] The Commission's attempt in *Computer II* to explain its decision to exempt all carriers save AT & T after originally exempting only carriers with revenues under $1,000,-000 lacks any persuasive power. The FCC simply recited that AT & T had "national market power" as though those words had talismanic significance. We are left with no explanation of why AT & T's power in some undefined, perhaps regulated, perhaps unregulated "national market" provides a rational basis for drawing the regulatory line between AT & T and all other communications carriers. Why suddenly did carriers such as GTE, with revenues of $3,894,000,000, and United Telecommunications, with revenues of $1,084,956,000,[25] lose their ability to cross-subsidize? *Computer III,* like *Computer II* before it, fails to answer this question. Because the FCC has never explained how "national market power" relates to the threat of cross-subsidization, we must conclude that we have no basis on which to discern whether the FCC's current policy choice is rational.

We are also unpersuaded by the Commission's new-found faith in *Computer III* that political and regulatory forces in the states will exert pressure on the BOCs to "minimize rural, residential, and small business local exchange rates, even to levels below cost," thereby "limit[ing] the BOCs' ability to shift costs to regulated [basic] services." *Phase I Order,* 104 F.C.C.2d at 1010; *Phase I Reconsideration,* 2 FCC Rcd at 3039. As we note above, the BOCs made the same claim five years ago when the FCC originally imposed structural separation requirements on them. The FCC rejected the argument on the ground that given the difficulty of determining the proper allocation of costs for basic and enhanced services, state regulators had no effective means of ensuring that ordinary

---

**23.** Moreover, in its tentative ruling in *Computer II,* the Commission decided that GTE should be required to maintain structural separation but then reversed itself in the final decision. *Computer II Reconsidered Decision,* 84 F.C.C.2d at 72–75.

**24.** The dissent is correct that the propriety of the Commission's holding in *Computer II* is not

before us. Dissent at 1248. We refer to the earlier Computer Inquiries to make the point that the FCC fails to provide us with any standard for determining when a carrier's monopoly revenues suffice to pose a threat of cross-subsidization.

**25.** These are GTE's and United's revenues for 1978. *See Computer II,* 77 F.C.C.2d at 471.

telephone users were protected against cost-shifting. *See BOC Separation Order,* 95 F.C.C.2d at 1130–31. In *Computer III,* the FCC does an about-face, and insists that state regulation will now be more effective, but provides neither record support nor analysis for its new position. It offers no evidence that conditions at the state level have changed, or that it erred in the *BOC Separation Order.* Indeed, the Commission refers to *nothing* in the record; it simply relies upon the bald assertion that state regulators have become more effective in protecting ratepayers against improper cost-shifting.

Finally, the FCC states that "[d]ivestiture eliminated AT & T's control over the most significant operations it could use for cross-subsidization—its former local exchange companies." *Phase I Order,* 104 F.C.C.2d at 1005; *see also Phase I Reconsideration,* 2 F.C.C.Rcd at 3038. The Commission, however, ignores its finding in the *BOC Separation Order* that those local exchange companies and the monopoly revenues they generate, now in the hands of the BOCs, continue to provide significant opportunity and incentive for subsidizing unregulated activities to the detriment of both ratepayers and enhanced services competitors. The FCC has pointed to no change in circumstances which indicates that the danger of cross-subsidization by the BOCs has diminished since the *BOC Separation Order.* Rather than identifying changed circumstances, the Commission asserts that because it announced in the *BOC Separation Order* that it would eventually reevaluate the need for separation requirements, it has broad authority to do so. We do not dispute that the FCC has the authority to rethink its post-divestiture policies in light of changed circumstances. It must, however, provide reasoned explanations for its policy changes. Here, the Commission's explanation is that circumstances have changed; yet, it fails to cite any changes since the *BOC Separation*

*Order* that logically reduce the danger of cross-subsidization by the BOCs.

The only information in the voluminous *Computer III* record that even purports to explain the FCC's decision is its statement that the divested BOCs now resemble GTE. But this so-called resemblance tells us nothing, for the FCC has lacked any consistency in fitting GTE into its structural separation policies. Under the *Computer I* regime, GTE was required to offer enhanced services through separate subsidiaries because it had annual revenues exceeding $1,000,000. Under the original *Computer II* order, GTE, along with AT & T, was required to continue to maintain structural separation. However, on reconsideration, the FCC lifted the requirement from GTE. At the time of the *BOC Separation Order,* the FCC determined that the divested BOCs did not compare with GTE. Now in *Computer III,* the FCC has decided that, in fact, they do. The FCC's classification of GTE has been at best inconsistent and at worst totally random as has been its comparison of GTE with the individual BOCs.

In sum, the four purported "changes" in the telecommunications market identified by the FCC lend no support to its conclusion that the risk of cross-subsidization by the BOCs has decreased. We are left with the Commission's assurance that cost-accounting regulations will be sufficient to "minimize" the BOCs' ability to misallocate costs, *Phase I Order,* 104 F.C.C.2d at 1010, along with its profession that it has other unidentified methods of preventing cost-shifting.[26] *See supra* p. 1233; *see also* FCC Brief at 104–05. But as we have already pointed out, the Commission's consistent position before *Computer III* has always been that monitoring and enforcement problems make cost-accounting regulations an ineffective tool in detecting cost-shifting.[27] Should the BOCs be free to

---

**26.** We have already discussed the irrelevance of ONA, CEI, or the other discriminatory access policies to cross-subsidization. *See supra* p. 1233.

**27.** *See Computer I Tentative Decision,* 28 F.C. C.2d at 302 (The commingling of regulated and

unregulated operations and their associated costs "will tend to obscure, if not defeat, the ready identification and allocation for accounting and ratemaking purposes of the costs associ-

integrate their basic and enhanced operations, nothing in the record suggests that the FCC (or state regulators) will have any less difficulty than before in determining whether costs have been misallocated. Indeed, the only justification the Commission has offered for its heavy reliance on cost-accounting regulations in *Computer III* is that the risk of cost-shifting has been reduced by the four so-called "market changes." Because, as we have discussed, the record fails to show that these purported market changes have demonstrably reduced either cost-shifting opportunities or incentives, the Commission's justification for its new policy change lacks record support. In sum, the Commission has failed to explain satisfactorily how changed circumstances justify its substitution of nonstructural for structural safeguards to protect telephone ratepayers and enhanced services competitors from cross-subsidization.

### C. The Reasonableness of the FCC's Decision

The *Computer III* nonstructural regulations are designed to protect both ordinary telephone customers and the competitive enhanced services market. *Phase I Order*, 104 F.C.C.2d at 1010. We agree that the Commission has made a plausible case that lifting the structural separation requirements will benefit consumers of enhanced services by permitting the BOCs to operate more efficiently in the enhanced services market. We also agree that the Commission has made a plausible case that ONA, CEI, and the growth of bypass technology will be effective in reducing the risk of BOC access discrimination. Thus, the

record supports the FCC's determination that *Computer III*'s substitution of nonstructural for structural safeguards will benefit the enhanced service industry.[28] On the other hand, the record yields no support for the Commission's position that market and technological changes since *Computer II* and the *BOC Separation Order* have reduced the danger of cross-subsidization by the BOCs. We therefore hold that it was arbitrary and capricious within the meaning of section 10(e) of the APA for the Commission to abandon structural separation and rely on cost accounting regulations to provide regulatory protection for ratepayers and competitors against the harmful effects of cross-subsidization.

In conclusion, we emphasize that it is not our role to decide whether a rationale exists that would justify the FCC's decision to abandon the *Computer II* and *BOC Separation Order* regulatory framework. *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 ("we may not supply a reasoned basis for the agency's action that the agency itself has not given"). We can only review the rationale used by the Commission, itself—that changed circumstances have reduced the danger of cross-subsidization.[29] We cannot review a rationale that the Commission could conceivably have used, but did not. Unlike "minimum rationality" review under the due process and equal protection clauses, "arbitrary and capricious" review under the APA does not permit us to impute reasons to the agency and uphold its action if it has any conceivable rational basis. Although the Commission could have decided that the national interest in allowing the BOCs to compete more effi-

---

ated with each activity."); *Computer II Final Decision*, 77 F.C.C.2d at 464 ("While accounting has always been a fundamental regulatory tool utilized by the Commission in the exercise of our statutory responsibilities, its use has by no means been recognized as a substitute for structural separation.").

**28.** We note, however, that the elimination of structural separation might in the long run *harm* the enhanced services market. To the extent that the BOCs shift costs undetected, they have the potential to engage in anticompetitive predatory pricing in the enhanced services market.

**29.** We agree with the dissent that "[t]he FCC's cross-subsidization and non-structural safeguard determinations are simply factors in the weighing process which resulted in the Commission's ultimate decision to abandon structural separation." Dissent at 1251. Because we conclude that these determinations are not supported by the record, we must find the Commission's decision arbitrary and capricious. We cannot guess at how the FCC would have balanced the many factors it considered if it had considered these two factors in the light in which the record portrayed them.

ciently in the enhanced services industry justified reduced regulatory protection against cross-subsidization, that is not the case before us. As stated above, we are limited in our review to the reasons the FCC actually gave. Because those reasons are not supported by the record, we must hold that the Commission's decision to release the BOCs from the structural separation requirements is arbitrary and capricious and therefore in violation of § 10(e) of the Administrative Procedure Act.

### III

### THE PREEMPTION ISSUE

In *Computer III* the FCC issued orders preempting nearly all state regulation of the sale of enhanced services by communications common carriers.[30] Specifically, the FCC orders preclude state regulators from: (1) tariffing enhanced services sold by communications carriers; (2) requiring communications carriers to maintain structural separation between their basic and enhanced service operations; and (3) requiring nonstructural safeguards that are inconsistent with or more stringent than the FCC's nonstructural safeguards.[31] Petitioners argue that the FCC preemption orders violate § 2(b)(1) of the Communications Act, which denies the FCC jurisdiction "with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier." 47 U.S.C. § 152(b)(1) (Supp. V 1982).

#### A. *The Applicability of § 2(b)(1) to Enhanced Services*

■ The question of statutory interpretation presented for decision is whether § 2(b)(1) distinguishes between basic and enhanced telecommunications services.

The FCC concedes that § 2(b)(1) reserves to the states the sole authority to regulate intrastate basic telephone service, but argues that the statute does not bar the FCC from regulating enhanced services to the exclusion of state regulation of intrastate enhanced services. Petitioners challenge the *Computer III* preemption orders on the ground that the plain language of § 2(b)(1) forecloses the FCC's attempt to distinguish between basic and enhanced services for preemption purposes.

Simply put, petitioners contend that enhanced services are services "for or in connection with intrastate communication service by wire or radio of any carrier," 47 U.S.C. § 152(b)(1), because enhanced services consist of nothing more than the transmission of electronic signals over the telephone network. In this fundamental respect, petitioners assert, enhanced services are indistinguishable from basic services. Petitioners rely particularly on the broad language of § 2(b)(1) reserving to the states the authority to regulate services "for or in connection with" communication services provided by telephone carriers. This broad language, claim the petitioners, explicitly "fences off from FCC reach or regulation," *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986) (*Louisiana PSC*), both intrastate basic and enhanced services.

Given the fact that both basic and enhanced services are delivered by communications carriers over the same telephone network, and the broad "in connection with" language of § 2(b)(1), the Commission faces an uphill battle in defending its position that § 2(b)(1) distinguishes between basic and enhanced services. The gist of the Commission's argument is that enhanced services fall beyond the reach of

---

30. *See Phase I Order,* 104 F.C.C.2d at 1126–28; *Phase I Reconsideration,* 2 FCC Rcd at 3061–63; *Phase II Order,* 2 FCC Rcd at 3100–02.

31. The ONA and CEI requirements of *Computer III* are applicable to the BOCs and AT & T, but not to the independent telephone companies. The preemption order leaves the door open to state regulations subjecting AT & T and the

BOCs to nonstructural safeguards provided they are not inconsistent with ONA and CEI, as well as to state regulations subjecting the independent companies to nonstructural safeguards provided they are no more stringent than the ONA and CEI safeguards which *Computer III* imposes on AT & T and the BOCs. *See Phase II Order,* 2 FCC Rcd at 3102.

§ 2(b)(1) because enhanced services, unlike basic telephone services, are not offered on a "common carrier" basis.[32] In the Commission's view, the key words in § 2(b)(1) are "for or in connection with intrastate communication service by wire or radio *of any carrier*." Because the term "carrier" is synonymous with "common carrier" for purposes of the Act,[33] the Commission reasons, the words "of any carrier" must be interpreted to mean that § 2(b)(1) applies only to telecommunications services that are offered on a common carrier basis.

We reject the Commission's interpretation of § 2(b)(1).[34] We find nothing in the language of § 2(b)(1) to support the cramped reading advanced by the Commission. To the contrary, the broad language of § 2(b)(1) makes clear that the sphere of state authority which the statute "fences off from FCC reach or regulation," *Louisiana PSC*, 476 U.S. at 370, 106 S.Ct. at 1899, includes, at a minimum, services that are delivered by a telephone carrier "in connection with" its intrastate common carrier telephone services. When telecommunications services are delivered on an intrastate basis by telephone carriers over the telephone lines, they at the very least qualify as services "in connection with in-

trastate communication service by wire ... of any carrier." 47 U.S.C. § 152(b)(1). That these enhanced services are not themselves provided on a common carrier basis is beside the point. As long as enhanced services are provided by communications carriers over the intrastate telephone network, the broad "in connection with" language of § 2(b)(1) places them squarely within the regulatory domain of the states.

We are unimpressed by the Commission's argument that the words "of any carrier" in § 2(b)(1) must mean that Congress intended the reach of § 2(b)(1) to be limited to common carrier services. The plain meaning of the language "of any carrier" is that the statute applies to communications services provided by common carriers such as AT & T and the BOCs as distinguished from communications services provided by non-common carriers such as IBM. Thus, the distinction made by the statute is between *providers* of communications services, i.e., between carriers and non-carriers. When services are provided by communications carriers, the statute makes no distinction based upon the terms and conditions on which the services are offered, i.e., whether on a common carrier or private contract basis.[35]

**32.** A service provided on a common carrier basis is one that is offered to the public on standard terms. "[A] carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal." *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C.Cir.) (*NARUC I*), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Basic telephone services are common carrier services because they are offered to all consumers on standardized terms. Enhanced services, in contrast, are not regarded by the FCC as common carrier services, because they are "custom tailor[ed] ... to the particularized needs of the[ ] individual customers." *Computer II Final Decision*, 77 F.C.C.2d at 431.

**33.** *See* 47 U.S.C. § 153(h) (1982) (equating the two terms for purposes of the Act).

**34.** We reject the FCC's contention that *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) requires us to defer to the FCC's reading of § 2(b)(1) as an agency's reasonable construction of a statute that it administers. Under *Chevron*, "[i]f the intent of Congress is clear,

that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. As our discussion in the text indicates, we agree with the D.C. Circuit that the FCC's interpretation of § 2(b)(1) is contradicted by the express terms of the statute. *See National Ass'n of Regulatory Util. Comm'rs v. FCC*, 880 F.2d 422, 428 (D.C.Cir. 1989) (*NARUC III*). Accordingly, there is no question of deference to the Commission's interpretation.

**35.** The FCC attaches great significance to its decision to regulate enhanced services pursuant to Title I, 47 U.S.C. §§ 151–155, rather than Title II, 47 U.S.C. §§ 201–222, of the Communications Act. Title II contains the Act's basic grant of authority to the Commission to regulate common carriers. Title I, although it contains no specific grant of jurisdiction to the FCC, has been read to confer upon the FCC "ancillary" authority beyond that contained in the Act's specific jurisdictional grants. The Commission's argument, in essence, is that the words "of any carrier" demonstrate that § 2(b)(1) was meant to restrict the Commission's jurisdiction

We are equally unimpressed with the Commission's argument that the legislative history of the Communications Act demonstrates that § 2(b)(1) was intended only to protect states' jurisdiction to regulate intrastate common carrier telephone services. Before the Act was passed in 1934, state regulation had focused on common carrier services. During consideration of the 1934 Act, concern with maintaining states' regulatory authority over common carriers emerged as a prominent theme.[36] Congress' purpose in writing § 2(b)(1) into the Act, the Commission asserts, was to preserve the states' traditional role in protecting consumers against monopoly abuses by telephone carriers providing ordinary telephone services. "Nowhere," says the Commission, "does the legislative history reveal any intention to insulate from federal regulation new types of communications services that might develop in the future and that the states never had regulated." FCC Brief at 65.

This exegesis of the Act's legislative history does not persuade us to abandon what we believe to be the unambiguous command of § 2(b)(1). As the Supreme Court noted in *Louisiana PSC*, even if it were true that Congress' dominant concern was to protect states' ability to control common carrier charges for intrastate telephone service, the language Congress chose reserved to the states expansive authority to regulate intrastate telecommunications. 476 U.S. at 372–73, 106 S.Ct. at 1900–01. "[W]here a statute is clear on its face, it is unnecessary to look to its legislative history to discern its meaning and scope." *In re Hudson*, 859 F.2d 1418, 1421 (9th Cir. 1988) (citing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978)).

Our rejection of the Commission's interpretation of § 2(b)(1) is in accord with the holding of the D.C. Circuit in *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 880 F.2d 422 (D.C.Cir.1989). There, the D.C. Circuit held that § 2(b)(1) denies the FCC power to preempt state regulation of "inside wiring" [37] that is used for both interstate and intrastate telephone service, despite the FCC's classification of the installation and maintenance of inside wiring as non-common carrier services. *See id.* at 426. The court reasoned as follows:

> *Louisiana PSC* establishes the governing principles for interpreting section 152(b). There the Court made clear that the Act, through section 152(b), establishes a system by which the states exercise the same authority over intrastate wire

only in those cases in which the Commission has chosen to exercise its Title II authority to regulate common carriers. Because it has chosen to regulate enhanced services pursuant to Title I, the Commission argues, § 2(b)(1) is simply inapplicable.

We are unpersuaded. There is nothing in the language of the Act to suggest that the "dual regulatory system," *Louisiana PSC*, 476 U.S. at 370, 106 S.Ct. at 1899 (emphasis omitted), established by Congress contains an exception for Title I regulation. Section 2(b)(1) is phrased in broad terms that sweep beyond Title II. To accept the Commission's proposed circumscription of § 2(b)(1) would be to do violence to the language of the Act.

Moreover, the Commission's argument misconceives the nature of its ancillary authority. Title I is not an independent source of regulatory authority; rather, it confers on the FCC only such power as is ancillary to the Commission's specific statutory responsibilities. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968) (FCC's Title I power "restricted to that reasonably ancillary to the effective performance of the Commission's various responsi-

bilities"). In the case of enhanced services, the specific responsibility to which the Commission's Title I authority is ancillary is its Title II authority is over common carrier services. *See CCIA v. FCC*, 693 F.2d 198, 213 (D.C.Cir.1982) (upholding FCC regulation of enhanced services as ancillary to Commission's authority over interstate basic telephone services); *GTE Serv. Corp. v. FCC*, 474 F.2d 724, 731 (2d Cir.1973) (same). The FCC's position, then, reduces to the anomalous proposition that § 2(b)(1) strictly limits the Commission's explicitly granted Title II powers, but imposes no restriction at all on the implied authority derived from those powers. We cannot agree. The system of dual regulation established by Congress cannot be evaded by the talismanic invocation of the Commission's Title I authority.

**36.** *See, e.g.,* 78 Cong.Rec. 4139, 8822–24 (1934).

**37.** "The term 'inside wiring' generally refers to the telephone wires within a customer's home or place of business that are on the customer's side of the point of intersection between the telephone company's communications facilities and the customer's facilities." *Id.* at 425.

communication as the FCC exercises over interstate wire communication:

> By its terms, this provision fences off from FCC reach or regulation intrastate matters—indeed, *including matters 'in connection with' intrastate service.* Moreover, the language with which it does so is certainly as sweeping as the wording of the provision [section 151] declaring the purpose of the Act and the role of the FCC.... We agree with petitioners that ... sections [151 and 152(b)] are naturally reconciled ... to enact a *dual* regulatory system....

476 U.S. at 370, 106 S.Ct. at 1899 (first emphasis added, second in original).

This passage and the language of section 152(b) compel us to reject the FCC's attempt to limit the reach of section 152(b) to "intrastate common carrier communication services." *Recon. Order*, 1 F.C.C.Rcd. at 1192, paras. 14–15. As the Court has made clear, section 152(b) 'not only imposes jurisdictional limits on the power of a federal agency, but also by stating that nothing in the Act shall be construed to extend FCC jurisdiction to intrastate service, provides its own rule of statutory construction.' *Louisiana PSC*, 476 U.S. at 376–77 n. 5, 106 S.Ct. at 1902–03 n. 5. Indeed, even if the statute could be interpreted to read 'intrastate common carrier communication service,' inside wiring would still fall within it as a facility or service offered 'for or in connection with' a common carrier communication service, namely, intrastate telephone service. Either way, we cannot countenance the Commission's attempt to rewrite the statute. *See id.* at 376, 106 S.Ct. at 1902.

*Id.* at 428.

We agree with the D.C. Circuit. The extent of the authority to regulate intrastate communications services reserved to the states by § 2(b)(1) does not turn on whether the services are provided on a common carrier or non-common carrier basis. The Commission's interpretation of § 2(b)(1) would require us to qualify the statute's sweeping language "for or in connection with intrastate communication service by wire or radio of any carrier" by adding the words "which the carrier provides on a common carrier basis." If the Commission advocates such an amendment to the statute, then it must make its case to Congress, not to the courts.

### B. *The "Impossibility" Exception to § 2(b)(1)'s Restriction on the FCC's Preemption Authority*

■ Having rejected the Commission's argument that § 2(b)(1) does not safeguard state authority to regulate intrastate enhanced services, we turn to the Commission's alternative argument that a portion of its *Computer III* preemption order is valid under an "impossibility" exception carved out of § 2(b)(1) by the Supreme Court in *Louisiana PSC.* In essence, the Commission argues that its preemption of state-imposed structural separation requirements and some state-imposed nonstructural safeguards is valid because such state regulations cannot feasibly coexist with the *Computer III* scheme.[38]

In *Louisiana PSC*, the Commission advanced this same argument in defending an order establishing uniform depreciation rates for telephone equipment used jointly for interstate and intrastate service. The Supreme Court rejected the argument, holding that § 2(b)(1) reserved to the states the right to set equipment depreciation rates for equipment used in providing intrastate telephone service. 476 U.S. at 373, 106 S.Ct. at 1901. Part of the Court's rationale was that separate FCC and state depreciation rates could coexist because it was feasible to allocate the cost of jointly used telephone equipment between interstate and intrastate use. *Id.* at 375, 106 S.Ct. at 1902.

The Court went on to suggest, however, that the Commission's uniform depreciation

---

**38.** The Commission does not defend its preemption of state authority to tariff enhanced services under the impossibility exception. However, the Commission does claim that the states are precluded from challenging the tariffing portion of its preemption order. We reject the Commission's argument. *See infra* Part IV.

schedule for equipment used jointly might have been valid if "it [were] *not* possible to separate the interstate and intrastate components of the asserted FCC regulation." 476 U.S. at 375 n. 4, 106 S.Ct. at 1902 n. 4. The Commission finds support in this language for the recognition of an "impossibility" exception to § 2(b)(1). The Commission also finds comfort in the Supreme Court's apparent approval of the Fourth Circuit's decisions in *North Carolina Utils. Comm'n v. FCC*, 537 F.2d 787 (4th Cir.) (*NCUC I*), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 652, 50 L.Ed.2d 631 (1976), and *North Carolina Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir.) (*NCUC II*), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 223, 54 L.Ed.2d 154 (1977). *See Louisiana PSC*, 476 U.S. at 375 n. 4, 106 S.Ct. at 1902 n. 4. In *NCUC I* and *NCUC II*, the Fourth Circuit upheld an FCC order preempting state regulations forbidding telephone customers from connecting their own terminal equipment to the telephone network. The Fourth Circuit upheld the order on the ground that FCC regulations permitting the connection of customer-owned terminal equipment to the telephone network for interstate communications could not feasibly coexist with state regulations prohibiting the use of customer-owned equipment for local service. In other words, the state regulations would effectively trump the FCC regulations because customers would not buy their own terminal equipment for interstate phone service if they were forbidden by state regulations from also using it for local service. The Fourth Circuit, after noting that "separation of terminal equipment used exclusively for local communication is a practical and economic impossibility," concluded that "if state commissions could lawfully prohibit interconnection unless terminal equipment is used exclusively for interstate communications, federal [regulations] authorizing interconnection would be made nugatory." *NCUC II*, 552 F.2d at 1043 (referring to conclusions reached in *NCUC I*).

We agree with the Commission that the language of *Louisiana PSC* requires us to recognize an "impossibility" exception to § 2(b)(1). The D.C. Circuit recently came

to the same conclusion in *NARUC III*, 880 F.2d at 429, and *Illinois Bell Tel. Co. v. FCC*, 883 F.2d 104, 113–15 (D.C.Cir.1989). "In sum, the *only* limit that the Supreme Court has recognized on a state's authority over intrastate telephone service occurs when the state's exercise of that authority negates the exercise by the FCC of its own lawful authority over interstate communication." *NARUC III*, 880 F.2d at 429.

The impossibility exception, however, is a limited one. The FCC may not justify a preemption order merely by showing that *some* of the preempted state regulation would, if not preempted, frustrate FCC regulatory goals. Rather, the FCC bears the burden of justifying its *entire* preemption order by demonstrating that the order is narrowly tailored to preempt *only* such state regulations as would negate valid FCC regulatory goals. As the D.C. Circuit held in *NARUC III*, "a valid FCC preemption order must be limited to [state regulation] that would *necessarily* thwart or impede" the FCC's goals. *Id.* at 430 (emphasis added). "The FCC has the burden ... of showing *with some specificity* that [state regulation] ... would negate the federal policy...." *Id.* (emphasis added). We are therefore faced with the task of deciding whether the FCC's regulation of interstate enhanced services would necessarily be frustrated by all possible forms of state-imposed structural separation requirements and by all state-imposed nonstructural safeguards that are inconsistent with *Computer III* requirements.

Our review of the record fails to persuade us that the *Computer III* preemption orders are "limited to [state regulation] that would necessarily thwart or impede" valid FCC goals.

(1) Preemption of State Structural Separation Requirements

First, the FCC has failed to carry its burden of demonstrating that *all* state-imposed separation requirements would negate its policy of permitting the structural integration of basic and enhanced services offered on an interstate basis. The Commission argues that any requirement that a

carrier separate its intrastate enhanced and basic services will necessarily force carriers to separate their interstate services as well, because the intra- and interstate components of enhanced services are structurally inseverable. *See Phase I Reconsideration,* 2 FCC Rcd at 3062. The Commission's argument fails because it neglects to address the possibility that enhanced services may be offered on a purely intrastate basis. For example, the state petitioners call our attention to voice mail services that are offered to discrete locales within a state. Other examples of purely intrastate enhanced services include alarm services and database services for schools. The FCC does not explain how the structural separation of such purely *intra*state enhanced services from basic telephone service would interfere in any way with a carrier's ability to provide *inter*state enhanced services (or enhanced services with mixed intra- and interstate components) on an integrated basis.

In addition, the FCC appears to base its inseverability argument on the assumption that state structural separation regulations would necessarily require separation of physical facilities. *See Phase I Reconsideration,* 2 FCC Rcd at 3061–62. The record, however, does not support this assumption. State regulations might require only that carriers establish separate corporate *organizations* for providing intrastate basic telephone and enhanced services, while allowing the same facilities to be used for both types of services. The Commission has failed to explain why requiring communications carriers to offer *intra*state enhanced services through a separate corporation would frustrate the Commission's goal of giving communications carriers the freedom to choose whether to integrate or separate their *inter*state operations.

The Commission has made a plausible argument that *some* forms of state structural separation requirements would negate its policy of permitting the integration of basic and enhanced services offered on an interstate basis. For example, a state-imposed requirement that carriers use separate physical facilities for all basic tele-

phone and enhanced services offered on an intrastate basis would almost certainly force carriers to separate their interstate services as well. However, the fact that state separation requirements could conceivably take forms that would frustrate valid federal goals is insufficient under the narrow "impossibility" exception to justify the Commission's preemption of *all* state regulations requiring some form of structural separation.

### (2) Preemption of State Nonstructural Safeguards

The record also fails to support the Commission's preemption of (1) all state nonstructural safeguards applicable to AT & T and the BOCs that are *inconsistent* with the nonstructural safeguards imposed on AT & T and the BOCs by the FCC, and (2) all state nonstructural safeguards applicable to the independent communications carriers that are *more stringent* than those imposed by the FCC on AT & T and the BOCs.

As with its arguments in defense of its preemption of all state structural separation requirements, the Commission's arguments in defense of its preemption of *inconsistent* nonstructural safeguards fail to support the full breadth of the FCC's preemption order. The FCC argues, for example, that *"[m]any of the Computer III* Open Network Architecture ("ONA") and Comparably Efficient Interconnection ("CEI") guidelines will require technical modifications to existing networks.... [S]uch technical requirements cannot be separated jurisdictionally." FCC Brief at 87 (emphasis added). As explained above, an argument that state regulation will negate valid federal purposes in "many" cases does not suffice to justify preemption of *all* state regulation in an area. The "impossibility" exception to § 2(b)(1) is a narrow one that may be invoked *only* when state and federal regulation cannot feasibly coexist. As the Supreme Court made clear in *Louisiana PSC,* the FCC must do more than pay lip service to Congress' intent "to enact a *dual* regulatory system." 476 U.S. at 370, 106 S.Ct. at 1899. "[T]he Commis-

sion may take appropriate measures in pursuit of [its] goal[s], but *only* to the degree necessary to achieve [them]." *NARUC III*, 880 F.2d at 430.

The Commission offers even less compelling justification for that part of its order preempting state nonstructural regulations applicable to the independents that are more ⸱tringent than those imposed by the Commission on AT & T and the BOCs. The Commission notes only that it is desirable "that [the independents] not be subject to a greater degree of regulation than are the BOC[s]," *Phase II Order*, 2 FCC Rcd at 3102, and fails to explain what valid FCC goal such regulation would negate. In the absence of even an attempt to demonstrate that state regulation would frustrate valid FCC goals, we cannot uphold this part of the FCC's preemption order.

## IV

### THE PRECLUSION ISSUE

The Commission contends that the doctrines of administrative finality and res judicata bar judicial review of the state petitioners' challenge to the portion of the *Computer III* order preempting state tariffing of enhanced services. This part of the *Computer III* order simply reaffirms the Commission's previous action in *Computer II*, which was "affirm[ed] ... in its entirety" in *Computer & Communications Indus. Ass'n v. FCC*, 693 F.2d 198, 203 (D.C.Cir.1982). The Commission now argues that because the validity of its preemption of state tariffing of enhanced services was determined definitively in the *Computer II* and *CCIA* proceedings, administrative finality and res judicata preclude the states from challenging *Computer III*'s continuation of the FCC preemption policy. We find the Commission's reliance on these preclusion doctrines to be misplaced.

▆▆▆▆ The doctrine of administrative finality generally bars a litigant from seeking review of administrative rulemaking after the statutory deadline for appeal has lapsed. *See, e.g., Eagle–Picher Indus. Inc. v. EPA*, 759 F.2d 905, 911–12 (D.C.Cir. 1985). This doctrine does not apply, however, when an agency itself initiates a new rulemaking proceeding which reopens, and seeks public comment on, issues decided in the previous proceedings. In such circumstances, a litigant may seek review of the new proceeding even if the agency ultimately reaffirms its earlier decision. *See Montana v. Clark*, 749 F.2d 740, 744 (D.C. Cir.1984), *cert. denied*, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). Because *Computer III* was issued pursuant to a new notice-and-comment rulemaking proceeding which fully reopened the preemption issues decided in *Computer II*, the administrative finality doctrine does not bar judicial review of the order preempting state tariffing of intrastate enhanced services.

▆▆▆▆ Nor is review of the tariffing preemption order barred by the doctrine of res judicata. Under res judicata, a final judgment on the merits ordinarily bars further claims by the parties based upon the same cause of action.[39] *See Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Res judicata does not act as a bar, however, "when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 480–81 & n. 22, 102 S.Ct. 1883, 1896–97 & n. 22, 72 L.Ed.2d 262 (1982).

We reject the Commission's res judicata claim. We hold that the petitioners in *CCIA* did not have a full and fair opportunity to challenge the Commission's preemption of state tariffing of enhanced services. The Commission's preemption order was buried in a footnote, *see Computer II Further Reconsidered Decision*, 88 F.C.C.2d 512, 541 n. 34 (1981), and was issued after the *CCIA* petitioners had already filed their

---

**39.** We use the term "res judicata" to signify "claim preclusion," as opposed to "collateral estoppel" or "issue preclusion." *See generally Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984) (distinguishing the two concepts). The Commission raises no collateral estoppel issue in this case.

opening briefs in the D.C. Circuit challenging the *Computer II* regulatory scheme set forth in the Commission's *Computer II Final Decision,* 77 F.C.C.2d 384 (1980), and *Computer II Reconsidered Decision,* 84 F.C.C.2d 50 (1980).[40]

It is conceivable that the petitioners in *CCIA* could have amended their petition to the D.C. Circuit to respond to the Commission's footnote. However, we are unwilling to conclude that this limited opportunity to respond to the FCC's footnote gave the state petitioners in *CCIA* a sufficiently full and fair opportunity to litigate. We are particularly unwilling to reach that conclusion in light of the public interest in the tariffing issue raised by petitioners and the public function that these state regulatory bodies serve. *Cf. United States v. Mendoza,* 464 U.S. 154, 162, 104 S.Ct. 568, 573, 78 L.Ed.2d 379 (1984) (public interest in government litigation relevant to applicability of preclusion rules). Accordingly, we hold that res judicata does not bar petitioners' present challenge to the FCC's order preempting state tariffing of enhanced services.

## V

## CONCLUSION

In summary, we hold (1) that the FCC's substitution of nonstructural safeguards for the federal structural separation requirements to which the BOCs were subject was unlawfully arbitrary and capricious; and (2) that the FCC has failed to carry its burden of showing that its preemption orders are necessary to avoid frustrating its regulatory goals. We therefore grant the petition for review, vacate the *Computer III* Orders, and remand to the Commission for further proceedings consistent with this opinion.

BOOCHEVER, Circuit Judge, concurring in part, and dissenting in part:

I concur in the majority opinion except for Part II. As to Part II, I respectfully dissent from the majority's conclusion "that the Commission's decision to release the BOCs from the structural separation requirements is arbitrary and capricious and therefore in violation of § 10(e) of the Administrative Procedure Act." Op. at 1239.

The FCC imposed structural separation on predivestiture AT & T in 1980 as part of *Computer II. Phase I Order,* 104 F.C.C.2d at 969. The enormous power of that huge corporation was considered a threat to the burgeoning computer enhanced services industry. After the breakup of AT & T in 1984, the FCC promulgated its *BOC Separation Order* in which it continued to require structural separation of the BOCs' enhanced services, *id.* at 975–77, "as a protective measure to ensure that emerging competitive forces would not be undermined and to protect ratepayers during the uncertainty surrounding divestiture." *Id.* at 1000. The Commission promised to reevaluate the need for separation of the BOCs' enhanced services in two years. *Id. Computer III,* which eliminates the structural separation requirements, represents that reevaluation.

As the majority points out, in our review of the FCC's *Computer III* decision, we can set aside that decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982); Op. at 1230.

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational

---

**40.** The Commission's *Computer II Further Reconsideration* order was adopted October 7, 1981, and released October 30, 1981. The opening briefs of all petitioners challenging the *Computer II* preemption orders were submitted before the end of September 1981. The Commis- sion does not dispute that "no party directly challenged this aspect [preemption of state tariffing of enhanced services] of the Commission's orders" in the *CCIA* litigation. FCC Brief at 11–12.

connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)).

We therefore must determine whether the FCC examined the relevant data and articulated a satisfactory explanation for its action. I agree with the majority that the Commission's cost/benefit analysis is the basis for its decision to eliminate structural separation requirements. I also agree that "[w]hile we scrutinize the FCC's evaluation of each individual cost and benefit, we make no attempt to exercise the judgment required in striking the balance between the competing costs and benefits." Op. at 1231. I fear, however, that the majority has substituted its own judgment in striking that balance.

In the course of its cost/benefit analysis, the Commission found "that the inefficiencies and other costs to the public associated with structural separation significantly outweigh the corresponding benefits." *Phase I Order,* 104 F.C.C.2d at 987. Reviewing the relevant costs, the Commission found that "[s]tructural separation effectively prohibits the offering of all enhanced services that could be efficiently integrated or collocated with AT & T's basic services, but that cannot be offered on a cost-effective basis subject to structural separation." *Id.* at 1002–1003. A similar cost exists with respect to the BOCs, on whom "[s]tructural separation imposes opportunity costs by discouraging [the designing of] innovative enhanced services that utilize the resources of the public switched network." *Id.* at 1007. Other costs noted by the FCC are the "direct costs on the BOCs from the duplication of facilities and personnel, the limitations on joint marketing, and the inability to take advantage of scope economies." *Id.* at 1008. The ultimate result of these costs is poorer consumer service in the forms of "delayed services and innovation," "direct duplicative costs," and "organizational inflexibility." *Id.* The majority "conclude[s] that the FCC could reasonably

decide on this record that structural separation impairs the BOCs' ability to achieve certain economies of scale and has impeded the development and marketing of some new forms of enhanced services." Op. at 1232.

In assessing the benefits of structural separation, the FCC "conclude[d] that the benefits of structural separation in protecting ratepayers and the enhanced services market from potential anticompetitive practices by the BOCs are not significantly greater than such benefits provided by nonstructural safeguards." *Phase I Order,* 104 F.C.C.2d at 1010. The Commission analyzed two benefits which it previously had hoped to gain from the imposition of structural separation. One of these benefits was preventing AT & T and the BOCs "from using [their] control of local and interexchange network facilities to discriminate against users or suppliers of competing unregulated offerings." *Id.* at 1006. "The FCC found that technological and market developments in the last few years have reduced the danger that the BOCs will discriminate against their competitors in providing access to the telephone network." Op. at 1232–33. The majority agrees that "the record supports the Commission's finding that technologies for ensuring equal access have improved, and may be effective in preventing discrimination in ways not feasible in the past." *Id.* at 1233.

The other previous benefit identified by the FCC was limiting AT & T's and the BOCs' "ability to cross-subsidize [their] unregulated offerings by improperly allocating some costs of those offerings to [their] regulated operations." *Phase I Order,* 104 F.C.C.2d at 1004–05. The Commission found that this "ability to shift costs from [their] regulated to [their] unregulated services has been reduced *to some extent* by industry changes." *Id.* at 1005 (emphasis added); *accord id.* at 1010. Recognizing that the BOCs retain some ability to shift costs, the Commission announced that it is "committed to developing cost allocation methods that will be required to minimize the ability of the BOCs to shift costs," *id.*

at 1010, and proceeded to implement some of these methods. *See id.* at 1012–92.

The majority finds that "the record yields no support for the Commission's position that market and ˙technological changes since *Computer II* and the *BOC Separation Order* have reduced the danger of cross-subsidization by the BOCs." Op. at 1238. On this basis, the majority concludes that the Commission's entire balancing of costs and benefits was arbitrary and capricious. *Id.* The majority takes two positions on the issue of cross-subsidization as it relates to the FCC's ultimate decision: 1) recent market and technological developments in the telecommunications industry have not reduced the risk of BOC cross-subsidization, and 2) the nonstructural regulations proposed by the FCC were previously rejected by the agency as ineffective and so cannot be used now to justify the FCC's decision. I find neither of these positions tenable.

*Recent Developments*

Two of the numerous justifications the FCC advanced for its conclusion that recent developments have reduced the danger of cross-subsidization deserve particular attention. First, the Commission found that the monolithic power of AT & T was greatly diluted with its breakup and the creation of the smaller local BOCs. "Divestiture eliminated AT & T's control over the most significant operations it could use for cross-subsidization—its former local exchange companies." *Phase I Order*, 104 F.C.C.2d at 1005. "After the divestiture of the BOCs from AT & T, ... [t]he BOCs were smaller than the predivestiture AT & T, ... were unable to provide interexchange services, and in many respects individually resembled GTE, which we had exempted from the structural separation requirements." *Id.* at 999.

The majority rejects this analogy to GTE, "find[ing] no coherence in the Commission's policy shifts in deciding which carriers to subject to separation requirements." Op. at 1236. The majority is troubled that in *Computer I*, the Commission imposed structural separation based on gross revenues, but in *Computer II* exempted all

carriers except AT & T from these requirements. The majority also looks suspiciously on the fact that "in its tentative ruling in *Computer II*, the Commission decided that GTE should be required to maintain structural separation but then reversed itself in the final decision." Op. at 1236 n. 23. The propriety of the Commission's ruling in *Computer II* is not before us. To the extent we may consider the Commission's past decisions to guide our evaluation of the FCC's current policy choice, however, I do not share the majority's bewilderment at the Commission's earlier decision to single out AT & T for continued imposition of structural separation requirements. That issue was presented to the D.C. Circuit in *Computer and Communications Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). That court concluded that "the basis for the Commission's decision is rational and adequately explained," and found that

> [i]n reaching its decision to impose separation only on AT & T, the Commission considered four factors: (1) the carrier's ability to engage in anti-competitive activity through its control of local exchange facilities, (2) the carrier's ability to cross-subsidize its competitive activities through its monopoly services, (3) the degree to which the carrier possesses integrated research and manufacturing capabilities, and (4) the carrier's economic ability to enter the market through a separate subsidiary. The Commission also noted statistics regarding each carrier's revenues, market share, and market size.

*Id.* at 218–19 (footnote omitted). Thus, in contrast to the majority's characterization, the FCC did not use ˙"national market power" in any talismanic sense, but as a shorthand notation for a multifactor inquiry. Moreover, "the Commission exhibited thoughtful deliberation by exempting GTE from the separation requirement after receiving more information about the nature and extent of GTE's resources." *Id.* at 219. I cannot agree with the majority that "[t]he FCC's classification of GTE has been at best inconsistent and at worst totally

random," Op. at 1237, or that the FCC's prior inquiry provides us with "no basis on which to discern whether the FCC's current policy choice is rational." *Id.* at 1236.

The second recent development affecting the BOCs' ability to cross-subsidize is "[t]he availability of bypass and other new technologies [which] places some limits on the BOCs' ability to shift costs from their unregulated services to their regulated offerings without reducing the demand for those offerings." *Phase I Order,* 104 F.C.C.2d at 1010. Specifically, the FCC cites the development of private networks and shared tenant services which would allow telephone users to bypass the BOCs' local exchange facilities. The majority rejects this justification, stating that "although the record contains an impressive array of evidence demonstrating the technical feasibility of bypass, the record contains no evidence that bypass has become a realistic option for any appreciable number of ordinary telephone users." Op. at 1235. It is reasonable to conclude, however, that if the BOCs charged higher rates to basic telephone ratepayers through cross-subsidization, the economic benefit of alternative services would accelerate development of bypass networks. In this area of rapidly evolving telecommunication technology, the line between feasibility and availability is not as bright or inflexible as the majority believes. Moreover, the agency stated that these new technologies would *limit,* not eliminate, the opportunities for cross-subsidization. I believe the record adequately supports such a proposition.

The FCC specifically did "not conclude ... that the BOCs' motivation to cross-subsidize has decreased because of these developments. Nor do[es it] underestimate the potential danger that BOCs could misallocate costs." 104 F.C.C.2d at 1010. Rather, the agency found "that even if structural separation has a net positive benefit in an absolute sense, if alternative safeguards are on the whole more beneficial to society, then it would be incumbent upon [the Commission] to replace structural separation with those alternative safeguards." *Id.* at 1001.

The FCC concluded, based on what I believe was a sufficient record, that the danger of cross-subsidization by the BOCs has been reduced with the breakup of AT & T and the availability of bypass technologies. Even if that reduction has been slight, it is for the Commission to weigh that reduction with the other relevant factors in reaching its ultimate decision. The majority agrees with the FCC that the costs of structural separation are at least as high as they were at the time of the FCC's decision in *Computer II* and the *BOC Separation Order.* Op. at 1232. The majority also agrees that prevention of discriminatory access is not as great a benefit of structural separation as it once was. *Id.* at 1233. Viewing the FCC's finding on cross-subsidization in light of these other factors, as I believe we must, I cannot say that the FCC's ultimate decision to abandon structural separation is unsupported by the record, or that it was arbitrary and capricious.

*Nonstructural Regulations*

The FCC also stated that "[w]hile we have found that structural separation no longer serves the public interest, that finding was explicitly conditioned on the adoption and implementation of an effective set of nonstructural regulations to guard against the continued potential for improper cost shifting and discrimination by dominant carriers." *Id.* at 1013. The question then becomes whether the nonstructural regulations proposed by the FCC to guard against cross-subsidization provide additional support for the FCC's decision to abandon the structural separation requirements. The majority is unable to "find any record support for the FCC's abandonment of its original position that cost-accounting regulations are relatively ineffective means of preventing improper cost-shifting." Op. at 1233. I disagree.

In connection with its abandonment of structural separation, the FCC established numerous nonstructural safeguards to reduce the danger of cross-subsidization and anti-competitive action by the BOCs, including: 1) adoption of the principle of full

allocation of costs across services, rejecting the view that unregulated activities should bear only the incremental or marginal costs they cause, *Joint Cost Order*, 2 F.C.C.Rcd at 1312–13; (2) requiring that the additional costs of upgrading or replacing facilities primarily for the benefit of unregulated services be excluded from the regulated accounts, *id.* at 1313; (3) adoption of specific allocation rules requiring that a carrier charge nonregulated activity at the tariff rate for any tariffed services it uses, *id.* at 1318; (4) requiring allocation of costs directly to the relevant activity where possible, and otherwise assigning costs on the basis of a formula related to the allocation of other costs and expenses, *id.;* (5) adoption of rules governing transactions between affiliates, *id.* at 1337–38; (6) imposition of comparably efficient interconnection (CEI) and open network architecture (ONA) requirements, *Phase I Order*, 104 F.C.C.2d at 1018–68;[1] (7) imposition of the Network Information Disclosure requirement, *id.* at 1077–86;[2] and (8) imposition of the Customer Proprietary Network Information requirement, *id.* at 1086–92.[3]

These requirements and the regulatory scheme they embody warrant our maximum deference. Reviewing the FCC's initial imposition of structural separation requirements in *Computer II*, the D.C. Circuit noted:

> No aspect of the *Computer II* rules more warrants our deference than these requirements. The Commission, having chosen a permissible regulatory tool—structural separation—set out detailed plans for implementing it. These plans

were based upon the Commission's own expertise and experience in regulating the communications industry and upon the comments of the members of that industry. This court is ill-prepared to decide which mechanical requirements would best implement the structural separation scheme. Our only province is to determine whether the separation requirements were "based on a consideration of the relevant factors and whether there has been a clear error of judgment."

*Computer and Communications Indus.*, 693 F.2d at 219 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). In *Computer III*, the FCC has chosen different regulatory tools, nonstructural safeguards, and set out detailed plans for implementing them. I believe that we, too, are ill-prepared to decide which nonstructural safeguards would best implement the FCC's regulatory scheme. Moreover, the environment in which the FCC examined its previous rejection of nonstructural safeguards has changed. In light of the technological and market changes that have occurred since 1980 when *Computer II* was decided—including the reduced market power of individual BOCs compared with predivestiture AT & T, the increased strength and stability of other providers of enhanced services, the competitiveness between the BOCs, and the Commission's finding that the benefits of structural separation no longer outweigh its costs—the FCC's decision to impose nonstructural

1. CEI requires "that if a carrier offers an enhanced service, it should be required to offer network interconnection (or collocation) opportunities to others that are comparably efficient to the interconnection that its enhanced service enjoys." *Id.* at 1019. ONA differs from CEI only in that it is "broader in concept" than CEI, and that it deals not with service-specific standards but with "the overall design of a carrier's basic network facilities." *Id.* ONA requires that "all users of the basic network ... [be allowed] to interconnect to specific basic network functions and interfaces on an unbundled and 'equal access' basis." *Id.*

2. Pursuant to this safeguard, "AT & T and the BOCs ... will be required, for all new network

services or changes to existing network services that affect the interconnection of enhanced services with the network, to notify the enhanced services industry that such a change is planned." *Id.* at 1083.

3. Under this requirement, AT & T and the BOCs' enhanced services operations are permitted to have access to information about customer use of the basic network services, "provided that [they] establish[ ] procedures to honor requests from customers that their [information] (i) be withheld from ... enhanced services personnel, and (ii) be released to other enhanced services vendors." *Report and Order*, 2 FCC Rec. 3072, 3093 (1987).

safeguards as opposed to structural separation requirements represents a different means of effecting an established policy rather than "an unexplained change from the FCC's original position." Op. at 1233–34.

More fundamentally, however, just as we cannot look at the Commission's cross-subsidization determination in isolation, we cannot view the FCC's decision to impose nonstructural safeguards separately from its cost/benefit analysis of structural separation. The FCC's cross-subsidization and nonstructural safeguard determinations are simply factors in the weighing process which resulted in the Commission's ultimate decision to abandon structural separation. The FCC did not decide that the danger of cross-subsidization has been eliminated—only that it has been reduced, like the danger of inferior access, to the point where it is outweighed by the costs of structural separation. Similarly, the Commission did not determine that nonstructural safeguards are more effective than structural separation, or even as effective as structural separation—rather, it found that they are *preferable* to structural separation in light of the relative costs and benefits. The FCC rationally reached this conclusion based on the record before it.

As the majority opinion and this dissent make clear, the FCC considered numerous relevant factors before reaching its decision, including "the comments of various parties, business practices in the communications industry, the costs and benefits of various degrees of separation, and the efficacy of various separation tools." *Computer and Communications Indus.*, 693 F.2d at 219. I find that the Commission's decision to eliminate structural separation requirements in favor of nonstructural constraints was based on a consideration of these factors, and I cannot say that this decision is the result of a clear error of judgment. Accordingly, I cannot agree with the majority that the decision was arbitrary and capricious.

We are engaged in reviewing decisions made in a highly technical, rapidly changing industry. I believe that the FCC has given adequate reasons for its decision to abandon structural separation and to substitute nonstructural safeguards.